(No. 6644.   July 7, 1939.)

In the Matter of the Estate of MARY ELIZABETH RANDALL, Deceased.

[93 Pac. (2d) 1.]

420

A. H. Oversmith and W. F. McNaughton, for Appellants.

Murray Estes and J. M. O'Donnell, for Respondents.

HOLDEN, J.—October 24, 1929, Mary Elizabeth Randall made a purported last will and testament by which she bequeathed and devised all her property (1420 acres, worth $60 an acre) to two daughters, Mattie L. Randall and Eva O. Randall, nominating such daughters executrices to execute the instrument. October 29, 1934, she died in Latah county leaving surviving her the following named sons and daughters: Mattie L. Randall, Eva O. Randall, Ora Randall Stevens (now Johnson), Almeron E. Randall, Arthur W. Randall, and Barnard Randall, Wayne Randall and Dean Randall, children of Alfred B. Randall, a deceased son.

December 10, 1934, Mattie L. and Eva O. Randall filed a petition in the probate court of Latah county praying the instrument be admitted to probate. Thereafter appellants filed written objections to the admission of the instrument on the ground it was procured by fraud and undue influence. The probate court admitted the will to probate and contestants thereupon appealed to the district court, where a trial *de novo* was had before Hon. Miles S. Johnson, presiding judge. At the conclusion of the evidence on behalf of contestants proponents moved for a nonsuit which motion was denied. Thereupon proponents introduced evidence in opposition to the contest and after the case was rested on both sides, proponents again moved to dismiss the appeal, and for judgment of nonsuit and also moved for an instructed verdict, which motions were denied. The court thereupon instructed the jury and, after deliberating on the matter, the jury returned an unanimous verdict in favor of contestants. Proponents then moved judgment be entered in their favor notwithstanding the verdict, which motion was granted. Thereupon contestants appealed to this court (*Estate of Randall*, 58 Ida. 153, 70 Pac. (2d) 389). On that appeal this court said:

"The principal assignment of error relied on is made against the action of the trial court in entering judgment notwithstanding the verdict of the jury. After a very thorough examination of the evidence, we are satisfied the court

correctly denied the motion for nonsuit, and the motion for an instructed verdict. On the other hand, we are equally well convinced that the court erred in granting judgment notwithstanding the verdict. The facts and circumstances submitted to the jury, as disclosed by this record, are such as might very well lead different minds to reaching different conclusions upon the issue presented; and where such is the case, however meager the evidence, if it is of a substantial nature and character, the findings of the triers of fact should prevail.''

''In view of our conclusion, that the judgment notwithstanding the verdict was improperly entered, we are confronted with the question as to whether we shall direct a judgment to be entered upon the verdict or order a new trial. It is apparent, of course, that the trial court finally concluded that there was no substantial evidence to sustain the verdict and that he should have directed a verdict in the first instance. It also follows that, had proponents moved for a new trial instead of for a judgment notwithstanding the verdict, the trial court would undoubtedly have granted the motion. In this state of the case we have concluded to remand the case with directions to grant a new trial.''

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

''We have refrained from quoting or analyzing the evidence in this case for the reason that we are ordering a new trial and do not want any recital or comment of ours to be taken as indicating any view of ours as to the materiality, weight, or probative value of any fact or circumstance adduced in evidence.''

May 17, 1938, the cause was again tried. Upon the second trial Hon. Gillies D. Hodge presided. At the conclusion of the submission of evidence proponents moved the court to instruct the jury to return a verdict in their favor, which motion the court denied. May 21, 1938, the jury returned an unanimous verdict in favor of contestants. Judgment was then entered reversing the judgment of the probate court and adjudging the will was procured by fraud and undue influence. July 15, 1938, proponents moved for a new trial upon numerous grounds, among others, that the evidence was in-

sufficient to justify the verdict. August 17, 1938, the court granted a new trial upon the ground ''that there has been a miscarriage of justice by the verdict of the jury, and that the same is not supported by a fair preponderance of the evidence.''

October 1, 1938, contestants appealed to this court.

While proponents moved for a new trial upon numerous grounds, the court granted the motion upon the ground there had been a miscarriage of justice and that the verdict of the jury was not supported by a fair preponderance of evidence as above stated. And, it may be added, neither proponents nor contestants claim there was any misconduct on the part of the jury, or that error was committed during the course of the trial.

As hereinbefore pointed out, upon the first trial of this cause in the district court, the jury returned a verdict in favor of contestants, whereupon proponents moved judgment be entered in their favor notwithstanding the verdict, and the motion was granted. Upon appeal, however, this court granted a new trial. The cause having been retried and the second jury having likewise returned a verdict in favor of contestants, and the trial court having granted proponents a new trial, and contestants having again appealed, we are confronted with the question as to whether this (a reviewing) court, may, if it reaches the conclusion (after an examination of all the facts and circumstances shown by the record) the trial court abused its discretion in ordering a new trial (where, as here, two juries have returned similar verdicts), vacate such order.

Contestants contend: ''Where a case has been before the Supreme Court and the Court has determined all of the questions of law involved in the case holding it is a case for the jury and has remanded the case for resubmission to a jury for its verdict and the jury upon the same and additional evidence returns a verdict, it is an abuse of discretion for the trial judge in the absence of any errors of law or misconduct of the jury occurring at the trial to set aside that verdict,'' citing *Monarch G. & S. M. Co. v. McLaughlin*, 1 Ida. 650; *Lowe v. Long*, 5 Ida. 122, 47 Pac. 93; *Ross v. Swear-*

*ingen,* 39 Ida. 35, 225 Pac. 1021.; *Applebaum v. Stanton,* 47 Ida. 395, 276 Pac. 47; *Rayborn v. Salmon River Canal Co., Ltd.,* 50 Ida. 297, 295 Pac. 1001. We have examined *Lowe v. Long, Ross v. Swearingen, Applebaum v. Stanton,* and *Rayborn v. Salmon River Canal Co., Ltd., supra.* The last-named cases do not appear to be in point on the question as to whether it is an abuse of discretion to grant a new trial for a second time after two juries have returned identical verdicts, but this question was considered from a slightly different angle in *Monarch G. & S. M. Co. v. McLaughlin, supra.* There the first trial was before one district judge and the second before another; upon both the first and second trials, the jury returned a verdict in favor of the defendants; following each verdict, a motion for a new trial was made upon the ground of insufficiency of the evidence to justify the verdict. The difference between the two cases, the Monarch case, *supra,* and the case at bar, being that in the Monarch case the motions for a new trial were denied, and in the case at bar, new trials were granted. In the Monarch case, *supra,* this court said:

"It has been a debated and vexed question, as to whether, after the court that tried the case has decided that the verdict must stand, an appellate court can, notwithstanding, order a new trial. The presiding judge has heard, and what is more important, has seen the witnesses testify, noticed their demeanor, listened to their cross-examination; minute circumstances which are often the turning point in a case have not escaped him. The evidence has been presented full and fresh to his mind after passing through the slow and severe ordeal of judicial scrutiny. He has the benefit of siftings of counsel. On the other hand, the appellate court has enjoyed none of these advantages; it receives the testimony on paper, and thus presented, it is always tame, meager, and unsatisfactory. Its whole knowledge of the case being thus derived, it is but illy qualified to pass an enlightened judgment upon it. The reasons, therefore, for denying to the appellate court the right to reverse the decision of the judge who tried the cause confirming the verdict, possess great weight; far greater and stronger do they become when we

apply them to the present case, where different judges heard the evidence and decided the same to be sufficient to justify the verdict.''

''Motions for a new trial are addressed to the sound discretion of the court, and are granted or denied, not as a matter of strict right, but as the substantial justice of the case may appear to require. In Indiana, it appears that in a civil case, only two new trials can be granted to the same party in the cause upon any grounds whatever. (*Roberts v. Robeson,* 22 Ind. 456.) ''

''This is a harsh and arbitrary rule, and might work great injustice in some cases. It does not obtain to any great extent beyond that state. *The general rule is, where the issue is solely of fact* (as in the case at bar) *that after two concurring verdicts the court will not grant a new trial if the questions to be tried wholly depend upon matters of fact and no rule of law violated, although the verdict be against the weight of evidence.''* (Italics mine.)

. . . . . . . . . .

''In *Swinnerton v. Marquis of Stafford,* 3 Trent, 232, the court says: The jury, who are the competent judges, have again had the case before them, and have decided it. Even if on nicely scrutinizing all the evidence, we had a doubt whether the verdict was right, it could be never right for us to make no weight of two verdicts of a jury in order to take the chance of a third. So, in *Talcot v. Commercial and Marine Insurance Co.,* 2 Johns. 467, *per curiam:* 'Here have been two trials in each of these causes on the same question of fact. As four different juries have found the vessel seaworthy, and on the last trial some further evidence was adduced on the part of the plaintiff, we do not think it expedient to disturb the verdict. The rule must be denied.' ''

''In *Fowler v. Aetna Fire Insurance Co.,* 7 Wend. 270, the court uses this language: 'I still think the verdict on this point is against the weight of evidence, but after two concurring verdicts in a case where there were many witnesses and a great deal of testimony on both sides upon a mere question of fact, supposing there was no misdirection, I should not think it a discreet exercise of the power of this court

again to interfere with the finding of the jury.' In *Barrett v. Rogers,* 7 Mass. 297, 5 Am. Dec. 45, the same doctrine is affirmed, and in *Frost v. Brown,* 2 Bay. 133, after a review of the testimony, the learned judge concludes: 'After all, if the objections to this verdict had much more weight with me than they have, yet I would not disturb this last verdict for another reason; a second trial has already been granted, and special juries have concurred in finding the same fact. I think we have no authority to proceed any further, for although I would never surrender a plain and certain rule of law to the caprice of a jury, or any number of juries, yet in a case where the law is complicated with facts so that the construction and application of it must depend on the finding of fact, *two concurrent verdicts even against the opinion of the judges, ought to be conclusive. I think a third trial ought not to be granted.' Numerous other authorities might be cited in support of the doctrine in the foregoing cases; we believe they are sustained by the weight of authority."* (Italics mine.)

Proponents however, contend: "The trial court, if convinced of the fact there was a miscarriage of justice, should grant as many re-trials as become necessary to secure justice in any case at bar," citing *Petroff v. Nunes,* 136 Cal. App. 416, 29 Pac. (2d) 293, where the court said:

"The sole point upon which appellant relies is his contention that the weight of the evidence supports the judgment which was rendered pursuant to the verdict, and that the trial judge has no discretion or authority to grant a new trial for a second time for a lack of evidence after two juries have returned similar verdicts based upon the same evidence. It is asserted that on appeal from a second order granting a new trial under such circumstances, the well established rule which requires an appellate court to affirm the order except for an abuse of discretion on the part of the trial judge, does not apply, and, upon the contrary, that the court of appeal should then weigh the evidence and decide in favor of the preponderance thereof."

"We are of the opinion a trial judge retains a discretion to grant a new trial a second time for lack of evidence to

support the judgment, even when he has previously granted a similar motion to vacate another judgment entered pursuant to a former verdict based upon the same evidence. It is true that a judge should exercise greater caution and scrutinize the evidence more carefully before he grants a second new trial after two juries have reached the same conclusion based upon the same testimony. It follows that upon appeal from a second order granting a new trial under such circumstances, while the trial court is still entitled to the benefit of the well-established rule that the order will be affirmed unless it appears that it was made as the result of an abuse of discretion, the reviewing court will be warranted in reversing the second order for a less aggravated abuse of discretion. Under our statute a trial judge is not only authorized but it is his solemn duty to exercise a sound discretion in requiring every verdict, no matter how many times a case is tried before him, to harmonize with the facts and the law of the case, to the end that justice may be subserved. Both the judge and the jury have their independent functions to perform, subject only to the sound and sensible restrictions of the law. With due respect for the great benefits derived from our jury systems, the conscientious and skilled judge, after all, must assume the final responsibility of seeing that all verdicts substantially conform to justice and law. There is nothing so infallible about the verdict of a jury as to render it unassailable under all circumstances. It is, however, true that a second verdict which reaches the same solution as that adopted by a former jury upon the same facts, furnishes more persuasive reason to assume that it is correct.''

To the same effect: *Davis v. Central States Fire Ins. Co.,* 121 Kan. 69, 245 Pac. 1062; *Gross Coal Co. v. City of Milwaukee,* 170 Wis. 467, 175 N. W. 793; *Credit Clearing House Adj. Corp. v. Stanfield,* 42 Ga. App. 562, 156 S. E. 708; *Guest v. Northern Motor Car Co.,* 149 Minn. 231, 183 N. W. 147; *Moilanen v. Blake Furniture Co.,* 119 Wash. 25, 204 Pac. 794; 46 C. J., p. 69, par. 21, also cited by proponents.

Proponents further insist a trial court may, if convinced there was a miscarriage of justice, ''grant as many,

re-trials as may be necessary to secure justice, even though there may be a substantial conflict in the evidence.'' In support of that contention, proponents direct our attention to *Bernier v. Anderson,* 8 Ida. 675, 70 Pac. 1027 (and other cases), where we held ''the rule that where there is a substantial conflict in the evidence the judgment will not be reversed, has no application to a trial court when exercising its jurisdiction in passing upon a motion 'for a new trial.'' The rule announced in *Bernier v. Anderson, supra,* was qualified in *Jones v. Campbell,* 11 Ida. 752, 84 Pac. 510, 515, in that this court held the judgment would not be reversed where there was a substantial conflict 'in the evidence, ''unless it appears from the record that the Judge had abused his discretion in granting a new trial, his action therein will not be reversed on appeal.'' (*Jones v. Campbell, supra,* was followed in *Wolfe v. Ridley,* 17 Ida. 173, 104 Pac. 1014, 20 Ann. Cas. 39, *Say v. Hodgin,* 20 Ida. 64, 116 Pac. 410, *Cox v. Cox,* 22 Ida. 692, 694, 127 Pac. 679, *Baillie v. City of Wallace,* 22 Ida. 702, 127 Pac. 908, *Turner v. First National Bank of Bancroft,* 42 Ida. 597, 248 Pac. 14, and *Egbert v. Twin Falls Canal Co.,* 52 Ida. 39, 11 Pac. (2d) 360.) It may be added that in none of said cases (cited by proponents), did the court consider or pass on the question as to whether it is an abuse of discretion to grant a new trial for a second time, after two juries have returned identical verdicts. They do make it clear however, it is the settled rule in this state if it appears a trial court has abused its discretion in granting a new trial, whether it be first or second, that this court will reverse the judgment. And, indeed, *Petroff v. Nunes, supra,* relied upon by proponents, apparently recognizes that rule.

Proponents contend no presumption of undue influence arises from the relation of parent and child, citing 68 C. J. section 451, page 762, and *Turner v. Gumbert,* 19 Ida. 339, 114 Pac. 33. Sec. 451, *supra,* reads:

''The influence of husband and wife over each other and their desire to provide for each other by will being considered natural and legitimate, the burden of proof is not shifted, nor a presumption of fraud or undue influence raised, by the fact that one is made a beneficiary in the will.

of the other, although the testator or testatrix is dependent on the spouse, or the will is made in accordance with the wishes of the spouse, unless coupled with proof of coercion. So, also, no presumption of undue influence changing the burden of proof arises from the relation of parent and child, brother and sister, and aunt or uncle and niece or nephew, even though a confidential or fiduciary relation also exist, unless circumstances indicating actual domination are shown.''

In *Turner v. Gumbert, supra*, this court held:

''The confidential relations naturally existing between a mother and daughter do not of themselves raise any presumption of undue influence on the part of the daughter, nor does the love and affection ordinarily manifested between parent and child create such presumption.''

Contestants insist it is not necessary to prove circumstances of either actual domination or coercion; that the only positive and affirmative proof required is of facts and circumstances from which undue influence may be reasonably inferred, for instance, that the beneficiary was active in the preparation and execution of the will, citing *Blackman v. Edsall,* 17 Colo. App. 429, 68 Pac. 790, 792, and Schouler on Wills (1926 Supp. sec. 305). On that point the Colorado court held:

''It follows from the very nature of the thing that evidence to show undue influence must be largely, in effect, circumstantial. It is an intangible thing, which only in the rarest instances is susceptible of what may be termed direct or positive proof. The difficulty is also enhanced by the fact, universally recognized, that he who seeks to use undue influence does so in privacy. He seldom uses brute force or open threats to terrorize his intended victim, and if he does he is careful that no witnesses are about to take note of and testify to the fact. He observes, too, the same precautions if he seeks by cajolery, flattery, or other methods to obtain power and control over the will of another, and direct it improperly to the accomplishment of the purpose which he desires. Subscribing witnesses are called to attest the execution of wills, and testify as to the testamentary capacity of the testator, and the circumstances attend-

ing the immediate execution of the instrument; but they are not called upon to testify as to the antecedent agencies by which the execution of the paper was secured, even if they had any knowledge of them, which they seldom have. Only general rules concerning the amount and character of evidence required to establish undue influence in the execution of a will can be laid down. As to what is sufficient must depend upon the facts and circumstances of each particular case. These general rules have been stated and restated in many hundreds of different cases in the courts of every jurisdiction considered authority in this country. Different language is used by the different courts, but one main, underlying principle, whatever the phraseology, is found in all: and that is that the evidence required to establish it need not be—indeed, cannot be—of that direct, affirmative, and positive character which is required to establish a tangible physical fact. The only positive and affirmative proof required is of facts and circumstances from which the undue influence may be reasonably inferred.'' (Schouler on Wills, sec. 305, *supra,* says):

''The general rule is that the mere existence of a confidential relation between the testator and a beneficiary in his will does not establish undue influence unless it appears that the beneficiary was active in the preparation and execution of the will.''

On the issue as to whether Mary Elizabeth Randall, deceased, was induced by fraud and undue influence to bequeath and devise all her property to proponents, a mass of testimony was adduced—nearly 1200 folios—much of it immaterial. From the mass, however, it can be gleaned that prior to the execution of the instrument, claimed to be the last will and testament of the deceased, several trips were made to the office of the family lawyer, George G. Pickett. On the first two trips, deceased was accompanied by both proponents. On each occasion they sat in the waiting room while deceased conferred with Mr. Pickett (since deceased) in his private office. The door between the two rooms was closed so proponents could not hear what was said by Pickett and deceased. At the second conference between deceased

and Pickett she came out of the private office (followed by Pickett) holding a paper in her hand, remarking "that she would let him (Pickett) know; she would study it (the paper held in her hand) over and let him know." Thereafter proponent Mattie Randall retyped the will prepared by Pickett, in the course of which, she admitted she made certain changes.

On direct examination she testified:

"Q. And did she (deceased) at that time tell you anything about why she wanted it retyped?

"A. Well, she said it didn't suit her.

"Q. It didn't suit her. Now did she make any specific objections to the will that you remember?

"A. Yes, sir.

"Q. What objection did she make to it?

"A. Well, in—Mr. Pickett had drawn that will so that I would be the executrix and she didn't want it that way. She wanted both of us, Eva and I both.

"Q. Did she say why she didn't want it that way?

"A. She said that I could draw the fees out of the estate, the executrix' fees out of the estate, and she didn't want it that way. She wanted us to both share and share alike. She didn't want me to have more than Eva.

"Q. And was there any other objection that she made?

"A. Well, she wanted, in case we should marry, that the income off the property would be our separate property.

"Q. Now, in redrafting the will, or retyping it, so as to meet the desires of your mother, it was necessary to make several changes in several different places on account of changing from a single executrix to two executrices, was it not?

"A. Yes, sir.

"Q. In other words, that change—that change had to be made in a number of paragraphs.

"A. Yes, sir."

" . . . .

"Q. All, right. Now, when you started to retype this will what happened?

"A. Well, I tried to write it to suit mama but I couldn't. I couldn't do it. I didn't know how to word it.

"Q. How long did you try that?

"A. Oh, I tried that for quite awhile.

"Q. On two or three or several occasions?

"A. Yes, sir. Yes, sir, I did.

"Q. Would you type something and submit it to her?

"A. Yes, sir, I would type it and read it to her and it didn't sound right to her and it didn't sound right to me either.

"Q. And she would tell you to tear that up and start over again?

"A. Uh-huh.

"Q. In the course of these endeavors on your part, they lasted over a period of three or four days, did they?

"A. Yes, sir, it did.

"Q. During the course of that endeavor, did you again visit Mr. Pickett's office?

"A. Yes, sir, I did.

"Q. And who accompanied you on that occasion?

"A. Mama went with me.

"Q. And where was Eva?

"A. Why—well, I think she must have been in the car. She wasn't with us. I think she must have been in the car.

"Q. But she didn't go with you to Pickett's office?

"A. No, sir, she didn't."

"  . . . .

"Q. Now, when you arrived at Mr. Pickett's office on that occasion did you—where did you go?

"A. We went in his private office.

"Q. Both of you?

"A. Yes, sir.

"Q. And at that time did your mother discuss the terms of the will with Mr. Pickett?

"A. She told him how she wanted it.

"Q. She told him how she wanted it?

"A. Yes, sir.

"Q. Did you offer any suggestions?

"A. No, sir, I did not.

"Q. And what did Mr. Pickett do?

"A. Well, he wrote out—he wrote out those parts that I couldn't write and gave them to mother and told me where to put them in."

" . . . .

"Q. Did you suggest to your mother, either then or at any time, that she draw the will so as to leave all of this property to you and to Eva?

"A. No, sir, I never did.

"Q. Did you ever, by word or deed, endeavor to turn your mother or poison her mind against your brothers or your sister?

"A. No, sir, I never did.

"Q. Did you ever mislead her with reference to their conduct?

"A. No, sir, I never did.

"Q. Did you ever discuss the conduct of your brothers and sister with your mother except when she brought up the subject herself?

"A. That was the only time."

Mattie did not testify on the first trial in the district court, but she did testify in the probate court on the hearing of the petition of proponents for probate of the paper claimed to be the last will and testament of Mary Elizabeth Randall. On the second trial in the district court, contestants called her for cross-examination under the statute for the purpose of examining her generally in regard to the preparation and execution of the paper, as well as concerning the testimony she gave in probate court. On such cross-examination she testified:

"Q. Miss Randall, you say you typed this will that your mother signed?

"A. Yes, sir.

"Q. And how long was that before she signed it that you typed it?

"A. Oh, I don't know. It was several days.

"Q. Several days before that?

"A. I was several days typing it.

"Q. But how long before—how long after you finally completed the typing of it, was it, that you went down to have it executed?

"A. Oh, I really don't know. I just don't remember that but I was several days typing it.

"Q. Yes, you had a will before you at the time for a guide, had you not?

"A. I had Mr. Pickett's will, yes, sir.

"Q. The one that Mr. Pickett had drawn?

"A. Yes, sir.

"Q. But you didn't follow that will very close?

"A. Well, all with the exception of two or three paragraphs.

"Q. It was?

"A. Yes, sir.

"Q. What were those paragraphs about?

"A. Well, I just don't remember now."

" . . . .

"Q. That in correcting his (Pickett's) mistakes, you, up there at the house, drew a whole document over again?

"A. Oh, I just retyped it and made the corrections."

" . . . .

"Q. But you did appear in Probate Court, didn't you?

"A. Yes, sir.

"Q. And you testified in the Probate Court?

"A. Yes, sir.

"Q. Now, in the Probate Court you was asked about this will, were you not?

"A. Yes, sir.

"Q. And you don't just agree with your sister on your drawing this will, do you?

"A. How's that?

"Q. You don't agree with your sister's testimony?

"Q. Do you agree with the testimony of your sister, Eva?

"A. Yes, sir.

"Q. You do now?

"A. Yes, sir, I do.

"Q. But you didn't in the Probate Court, did you?

"A. I was in a weakened condition at that time.

"Q. You were?

"A. Yes, sir.

"Q. I am going to ask you if this question was asked you in the Probate Court, referring to the will: 'Q. Do you

know whether he did the typewriting?' or, going back of that: 'Q. Did Mr. Pickett have the will drawn when you came to the office? A. I believe he called up and said for us to come down. Q. Do you recall—' I will ask several questions and then hand you this. 'I don't know anything about that. No, I believe he called up and said for us to come down.' Then the question was asked in Probate Court: 'Q. Do you know whether he did the typewriting? A. I don't know anything about that. Q. You don't know anything about that? A. I don't know anything about that. I never seen anyone typewrite it. Q. He didn't have it dated, did he? A. No, I don't know. I never seen the will. I don't know whether he had it dated or not.' Calling your attention to what purports to be a transcript of the testimony, I will ask you if that is the question propounded, questions and answers?

"A. Yes, yes, I suppose it is if it says it there. At that time I don't know what I testified to.

"Q. You don't know?

"A. I don't remember what I testified to at that time but you say it is the transcript. If that is the transcript I testified to it but then I didn't do any explaining at that time.

"Q. Now calling your attention to what purports to be a transcript of the testimony that you gave in the Probate Court in this case, was this here—these questions asked you and these answers made—and I will let you look at it: 'Q. You never talked the matter over with your mother at all with respect to making the will?'

"A. No, sir.

"Q. And it says here 'I never did.'

"A. No, sir, I didn't.

"Q. Then on direct examination, redirect examination by your attorney, Mr. Morgan, were these questions asked you and were your answers as follows: Mr. Morgan, 'Q. Miss Randall, up until after your mother had died do you know of or did you know what the contents of her will were, how she had disposed of her property?' and did you answer, 'I didn't know anything about it. Q. At the time your sister, Mrs. Stevens, was there from Spokane on the occasion

of your mother's death, had you read the will? A. I hadn't. Q. Had you ever discussed with your mother the contents of the will? A. No, no. Mother discussed the family with me though. Q. But you knew nothing, either by inspection or conversation with your mother, as to how she had disposed of her property? A. No, I didn't. I knew nothing about it.'

"A. Yes, sir, I testified to that, but I want to explain that, Mr. McNaughton."

" . . . .

"A. I didn't know that that was mama's will that I had typed.

"Q. You didn't know it was your mother's will?

"A. No, I didn't.

"Q. But you did when you took it out of the lock box?

"A. Yes.

"Q. And you took it up here to the Probate Court?

"A. Yes, sir, I knew it when I took it out and read it.

"Q. That was—when you testified was after that, after you took it up in Probate Court?

"A. That was afterward. I meant that I didn't know— I didn't know that was mama's will I typed until I filed the will.

"Q. Then after you filed the will you did know it, didn't you?

"A. Yes, after I filed the will, I did.

"Q. But you testified after you filed the will in regard to having it probated, didn't you, before the Probate Judge? That is what you were testifying to that day?

"A. Well, I didn't know it. I didn't know that was what I was testifying to. I didn't mean it that way. I meant—

"Q. Did you think you had drawn one will and it was some other will?

"A. I didn't know but what it might be."

On direct examination, proponent Eva Randall testified:

"Q. From the time you saw—withdraw that, if you please. Before you left the house on that occasion to go to Mr. Pickett's office, did you see the completed draft of the will; that is, I mean did you see it so that you could read it?

"A. Well, I could, I guess, if I wanted to but I never read it.

"Q. You didn't read it?

"A. No, I never.

"Q. And at the time then that your mother and Mr. Cahill and Mr. Pickett were there at the center desk in the lobby of the bank, did you of your own knowledge know whether the document or paper that they had was the will which had been prepared at the house?

"A. No, I never did."

"   . . . .

"Q. Did you ever seek in any manner to influence your mother in any way as to how she should dispose of her property?

"A. No, sir, I never did.

"Q. Did you ever talk with her about it except such conversations as occurred there when the will was being made?

"A. No, that is the only time.

"Q. Did you ever make to your mother any false or other statements with reference to any of your brothers or your sister with the intent to injure any of those children in your mother's opinion and affection?

"A. No, sir, I never did."

"   . . . .

On cross-examination, she testified:

"Q. You just said a moment ago that your mother and you and Mattie went down to the office and saw Mr. Pickett didn't you, in the first place?

"A. Yes.

"Q. And your mother and Mr. Pickett had a conference?

"A. Yes.

"Q. And then after that conference Mr. Pickett rang up the house and called you and Mattie and your mother down there again?

"A. Yes, sir.

"Q. And you went down again and your mother and Mr. Pickett had a conference in his private office, didn't they?

"A. Yes.

"Q. And your mother came out of the private office and took a paper home?

"A. Yes.

"Q. Now, that was the will that Mr. Pickett drafted, as you call it?

"A. Yes, that is it.

"Q. But what has become of that will?

"A. Well, I don't know.

"Q. That was never executed, was it?

"A. Not that I know of.

"Q. And you don't know what Mattie did with it or your mother did with it. Then Mattie changed that will, didn't she?

"A. Mama had Mattie change that will.

"Q. Well, it was changed there, wasn't it?

"A. Yes.

"Q. And Mr. Pickett didn't change it, did he?

"A. Mr. Pickett drafted it so that Mattie could type it.

"Q. He drafted it and Mattie retyped it, didn't she, and changed it? There was some changes?

"A. Yes, there was some changes in there, sure.

"Q. But you don't know what became of the real will Mr. Pickett drafted, do you, that she made the changes from?

"A. Well, that is the one there.

"Q. No, you said just a moment—

"A. Mr. Pickett, he drafted it and Mattie typed it. That is the one right there.

"Q. But what about the one you took from Mr. Pickett's office up to the house from which Mattie copied this? What became of that one?

"A. I don't know."

"  . . . .

"Q. But I think you said you knew everything that was in this will that was finally probated—offered for probate before it was signed?

"A. Well—

"Q. The one you say Mattie typed?

"A. Mama, she read it to Mattie and had Mattie type it and Mama was going to change it.

"Q. And you knew everything that was in it before it was signed?

"A. We couldn't help but know it because Mama read it out loud to us when she was trying to have Mattie change it but Mattie had to go back to Mr. Pickett's office—to get some notes—"

" . . . .

"Q. Let's see what that was about some more notes.

"A. Mama wanted Mattie to type that and Mattie tried and tried to fix it to suit Mama and Mama would dictate and Mattie wouldn't make any headway and Mattie had to go back down to the office, and Mama went with us, and they got some more notes on that—Mr. Pickett drafted some more and Mattie went home and then they got it fixed that time.

"Q. You said a moment ago, and that is a fact, is it not, Eva, that you went down and your mother talked with her lawyer and you and Mattie were not present?

"A. Not in the room with them.

"Q. They went into his private office?

"A. Sure.

"Q. As is usual, isn't it?

"A. Yes."

Apparently for the purpose of making it appear she was wholly indifferent and had no part and taken no interest in the matter as to how or to whom deceased devised and bequeathed her property—not even enough interest to know what paper was, in fact, executed by the deceased, Eva Randall testified on direct examination (as above shown) that before she left home on the morning the paper in question was executed, she could have seen, but did not see and had never read it, and she did not know of her own knowledge it was the same paper which had been prepared at the house, but on cross-examination she testified: "we couldn't help but know it (everything in the paper before it was executed) because mama read it aloud to us when she was trying to have Mattie change it." If the typing of the paper extended over a period of several days, as testified by Mattie, and Eva was in and out of the room and participated in some of the conversations in relation to it, as she testified, and deceased read the paper aloud "to us," then and in that case, Eva knew the paper was in course of preparation, knew its contents when

completed, and also knew it was being prepared for but one purpose, and for one purpose only—execution—so that when Mattie completed the preparation, and the paper had been read aloud, and the three—Eva, Mattie and the deceased—left home with the completed paper, Eva must have known what they were going up town for, in that surely she would not have gone up town aimlessly, without knowing why or what she was going for. It follows Eva well knew, not only that the paper executed in the bank was the same paper Mattie had drawn at home, but also, by its terms, all of the mother's property was devised and bequeathed to her and Mattie, and that the other children had been completely disinherited.

Proponent Mattie Randall testified in the probate court (as above set forth) she had never seen the will prepared by Pickett; that she never talked over the matter of making a will with her mother; that she had never discussed the contents of the will with her mother; that she knew nothing either by inspection of the will or conversation with her mother as to how her mother had disposed of her property—that she knew nothing about it. On the second trial in the district court she testified she did not know it was her mother's will she had typed until she filed it, yet she said she testified in the probate court after she had read and filed the will. On the second trial (as also above set out) she further testified the retyping of the paper in question "lasted over a period of three or four days"; that she had Pickett's will as a guide; that "Q. But you didn't follow that will very close? A. Well, all with the exception of two or three paragraphs. Q. It was? A. Yes, sir. Q. What were those paragraphs about? A. Well, I just don't remember now." Hence, the testimony she gave in the probate court was false and untrue in that she had both seen and read Pickett's will, using it as a guide in drawing the paper now claimed to be the last will and testament of Mary Elizabeth Randall; had discussed its contents with her mother; had inspected the paper and instead of not knowing anything about it, and not knowing anything as to how the deceased disposed of her property, she knew about both to the last detail. It is clear if Mattie told the truth while on the witness stand in the district court, she did not

tell the truth while on the witness stand in the probate court, and her "explanation" on that contradictory testimony to the effect she had undergone an operation and was in a "weakened condition," serves only to emphasize, rather than explain, the contradiction, in that there is no hint in the evidence the operation was such as to affect her mind or memory. Can it be seriously argued that Mattie, when on the witness stand in the probate court, had completely forgotten the toilsome hours (extending over several days) she said she spent drawing the paper in question so it would "suit" her mother; or her mother's alleged pronounced dissatisfaction with Pickett's will, in that it failed to place the property beyond the reach of some imaginary, designing husband, or the mother's fear that she, Mattie, as sole executrix, would draw the "fees out of the estate, and she didn't want it that way. She wanted us to both share and share alike. She didn't want me to have more than Eva." The conclusion Mattie had not forgotten is irresistible, and that her testimony in the probate court was given deliberately and for the purpose of having the paper she drew admitted to probate as the last will and testament of Mary Elizabeth Randall. And proponent Eva Randall knew, fully as well as Mattie, both the falsity of the testimony and the purpose in view.

Furthermore, Pickett was the family lawyer. He had prepared the will of the father, John Edgar Randall. When the mother decided to make a will, she employed him. Proponents accompanied her to his office. Twice she went alone into his private office to confer with him. Proponents were not invited into their conference. They sat in the waiting room. It is insisted deceased intended to will all her property to proponents. Now if that be true, why did she bar proponents from the private conferences with Pickett? If she intended, without pressure or undue influence, to give them all her property anyhow, why was it she did not invite them into the conferences? In that case there could be no reason whatever for keeping them out, but every reason for having them present. Moreover, if deceased herself actually wanted changes made in the will drawn by Pickett—those mentioned by proponents or any other—why didn't she have Pickett make the changes in his office where the original will was

drawn, instead of taking the will home and undertaking to make the changes herself by dictating the same to Mattie? Surely Pickett was more competent than either deceased or Mattie. In other words, why weren't the changes made in Pickett's office? A law office is commonly regarded as a very appropriate place, not only for the preparation of wills, but for making desired changes as well. Clearly, at the time deceased kept proponents out in Pickett's waiting room while she conferred privately with her trusted legal adviser, she did not want them to know how she intended to will her property, in this: If she had not wanted to keep that information from them, there would have been no reason for private conferences—especially with proponents so near, just out in the waiting room—of that, one need not seriously doubt. Nor, can it be doubted proponents later came into possession of the information which deceased took so much care to keep from them. Then followed the paper drawn by Mattie. She had before her as a guide the will drawn by Pickett (after two private conferences), which instrument (the Pickett will) would, if deceased had thereby actually willed all her property to proponents, have placed beyond all controversy the single question presented on the trial of this cause in the district court, as well as on this appeal, to wit: As to whether deceased was induced by fraud and undue influence to execute the paper drawn by Mattie, instead of the instrument drawn by Pickett. Notwithstanding that, no effort was made by proponents to explain how or in what manner that most important document was "completely lost," as testified by Eva, nor as to how the instrument could possibly have been lost, if, in truth and in fact, "mama threw it away," as testified by Mattie.

We have not thought it necessary to discuss the circumstance, that about ten days before the death of deceased she signed her name to endorsements (written by Mattie) transferring to proponents equally $56,000 in certificates of deposit.

Two juries have unanimously found, and we think correctly, the paper drawn by Mattie was procured by fraud and undue influence.

We are impelled to conclude, under all the facts and circumstances of this case, it was a clear abuse of the sound, legal discretion vested in the trial court, to grant a new trial.

The order granting a new trial is, therefore, reversed, vacated and set aside, and the trial court is hereby directed to reinstate the judgment made and entered May 21, 1938.

Costs awarded to appellants.

Ailshie, C. J., Budge and Givens, JJ., concur.

Morgan, J., deeming himself to be disqualified did not sit with the court at the hearing, nor participate in the decision.

Petition for rehearing denied.