592 P.2d 57

**Lillis GMEINER, personal representative of the Estate of Beryl MacArthur, Deceased, Plaintiff-Appellant,**

v.

**Danny V. YACTE and Ronda V. Yacte, husband and wife, and Elroy Frushour and Frances Frushour, husband and wife, Defendants-Respondents.**

No. 12201.

Supreme Court of Idaho.

March 13, 1979.

Pat W. Arney, Coeur d'Alene, for plaintiff-appellant.

Thomas M. Vasseur, Coeur d'Alene, for defendants-respondents Danny V. and Ronda V. Yacte.

C. J. Hamilton, Coeur d'Alene, for defendants-respondents, Elroy and Frances Frushour.

BISTLINE, Justice.

Beryl MacArthur died on September 22, 1973, at the age of 78. It is uncontradicted that in the last years of her life she made numerous transfers of property and money to the defendant-respondent Danny Yacte, a 32-year-old man who befriended her in those last years. On Beryl's death, Lillis Gmeiner, Beryl's sister, was appointed the personal representative of her estate. Beryl was unmarried and left no lineal descendents; her heirs at law are her six brothers and sisters. This suit against the Yactes and Frushours was filed in October, 1973, alleging undue influence on the part of Yacte, and knowledge thereof on the part of the Frushours, when they loaned money to Yacte in exchange for the deed to Beryl's house. The complaint demanded judgment against Yacte for $2,000 (the amount he allegedly received from Beryl out of the D. J. MacArthur estate of which Beryl was executrix), various other sums of money and a court order quieting title in the decedent in various properties.

Danny Yacte answered that the money and properties transferred to him from Beryl were all in consideration for her one-half interest in his business; that the fish business had failed leaving him with $15,000 in debts, of which $7,500 were valid claims against the estate; and that Beryl had executed an oral will giving all her property to him. The district court ruled before trial that nuncupative wills no longer existed in Idaho and struck the last claim. It held further that the $7,500 claim against the estate violated the statute of limitations (not having been filed within the 4-month limit) but that it remained as a possible set-off or counterclaim.

The Frushours answered that they received a warranty deed from Danny Yacte, the record title-holder of the property in question, to secure a loan to him of approximately $6,500, which loan had never been

paid. They prayed the court to order a judicial sale of the property to pay off the loan. Gmeiner replied that the Frushours knew of Yacte's alleged undue influence, that they held title to the property as equitable trustees for the estate and that the most they could hope to recover was the amount loaned to Yacte.

At jury trial, plaintiff Gmeiner presented numerous witnesses—real estate agents, neighbors, relatives—who testified concerning the various transactions and personalities involved. At the close of plaintiff's case, the Yactes and Frushours each moved for a directed verdict. The district court granted both motions. In addition, the court quieted title to Beryl's house in Yacte and ordered a foreclosure sale so that the Frushours could receive the money they had loaned on it. A motion for a new trial was denied.

I

▆▆ Gmeiner first argues on appeal that the trial judge committed reversible error by entering his own findings of fact and conclusions of law, contrary to what she alleges are the provisions of I.R.C.P. 52(a). Respondent Yacte admits that findings are not required by Rule 50(a), dealing with directed verdicts, and that Rule 52(a) does not envision a need for findings in such cases. He argues, however, that no rule *prohibits* the making of findings in such cases either. The trial court so ruled in denying objections to the findings.

Neither side has presented this Court with case citations as authority for its position. Nonetheless, it is respondent Yacte's argument which is correct. In a case squarely on point, a federal circuit court has held.

> If the court grants it [a motion for directed verdict] no findings of fact are necessary and upon review the evidence must be viewed in the light most favorable to the party against whom the motion is made. . . .
>
> We will therefore . . . disregard the findings of fact of the trial court, reviewing the entire evidence in the light most favorable to the plaintiff and giving him the benefit of all reasonable inferences which may be deduced from the evidence in his favor . . . . To adopt any other view in a jury case is to risk the deprivation of a plaintiff's right to trial by jury under the Seventh Amendment.

*O'Brien v. Westinghouse Elec. Corp.*, 293 F.2d 1, 9–10 (3d Cir. 1961). In short, since a motion for directed verdict in a jury trial presents the trial judge with a pure question of law, there is no need for him to enter his own findings of fact in such circumstances. The entry of findings, though superfluous, does not constitute reversible error. The task of the appellate court remains the same, namely, to determine whether plaintiff's evidence was sufficient to survive defendant's motion for a directed verdict and to justify submitting the case to the jury, *i. e.*, whether, as a matter of law, plaintiff produced sufficient evidence (not a mere scintilla) from which reasonable minds could conclude that a verdict in favor of the plaintiff was proper. *See Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 518 P.2d 1194 (1974); 9 Wright & Miller, Federal Practice and Procedure §§ 2524, 2536 (1971).[1]

---

1. Gmeiner's motion for a new trial contended that the trial court did not apply the proper standard in ruling on the motions for directed verdict. In ruling from the bench, the trial court did not state the standard being applied. In denying a new trial, the trial court's written order stated:

Plaintiff has filed herein a motion for new trial. Therein two specifications of error are set forth. The first of these reads as follows: ". . . The Court erred in granting the motion for directed verdict by failing to apply the proper standard to the issue of whether or not a motion for directed verdict should be granted;" this specification of error is not sufficient for consideration. It does not allege the standard applied by the Court nor does it set forth what standard should have been applied. The standard applied by the Court in testing the sufficiency of the plaintiff's case was that the motion for directed verdict should be granted only if the minds of reasonable men could not differ as to the conclusions to be drawn from the evidence. The Court also applied in that regard the standard that all reasonable and proper infer-

## II

The theory on which Gmeiner relied in her cause of action against defendant Danny Yacte was that of "undue influence."[2] After Gmeiner presented her case, both sets of defendants moved for a directed verdict, both motions being based upon the insufficiency of the evidence to make a *prima facie* case.

In ruling on the motions, the court below, in stating that "the record is completely void of any direct or positive evidence of any undue influence . . .", went on to analyze the evidence to see "whether or not any presumption or inferences arise" which would support the claim of undue influence. He concluded that the evidence was "not sufficient to show the existence of any confidential or fiduciary relationship between the Yactes and Beryl MacArthur." Citing *Kelley v. Wheyland*, 93 Idaho 735, 471 P.2d 590 (1970), he added that that case required as an element of proof that lack of consideration for a transfer or conveyance must be established, and "that the mere existence of a fiduciary confidential relationship will not give rise to any inference that a transaction between parties was without consideration." He ruled that evidence as to the element of consideration was "silent." Concluding, he added:

The record would show that at the time most of these were made, she was declining in physical health but still was a mentally competent person. There is nothing in the record to show that the transfer was made under any undue influence. In summary, there is no testimony of influence having been exerted over Beryl MacArthur, *there is no evidence of fact and circumstances from which it can be inferred that influence or any improper influence was asserted.* There is nothing really of record here to rebut the presumption that Miss MacArthur was at all times acting totally, mentally on her own free will and volition. For that reason the Defendants Yactes' motion for directed verdict will be granted.

Gmeiner, citing the second *In re Estate of Randall*, 60 Idaho 419, 93 P.2d 1 (1939), does not question the trial court's conclusion that she had no direct evidence tending to prove Yacte's undue influence.[3] Rather, citing statements of this Court found in *In re Lunders' Estate*, 74 Idaho 448, 454, 263 P.2d 1002, 1006 (1953) (quoting *In re Hannam's Estate*, 106 Cal.2d 782, 236 P.2d 208, 210 (1951)), wherein this Court said:

"Direct evidence as to undue influence is rarely obtainable and hence a court or jury must determine the issue of undue influence by inferences drawn from all

---

ences must be drawn from the evidence in favor of the plaintiff. The plaintiff not having pointed out wherein this standard was incorrect the motion for new trial on this stated ground will be denied. Plaintiff's second alleged ground for a new trial is that: ". . . and further erred in failing to properly allow all reasonable inferences that may be legitimately drawn from all of the evidence submitted and considered in the light most favorable to the plaintiff." This rule was in fact considered, allowed and followed by the Court in determining whether or not to grant the motion for directed verdict. Therefore the motion for new trial upon this alleged grounds [sic] of error will be denied.

2. Allegations of incompetency, fraud and duress were all dropped prior to trial.

3. In the second *In re Estate of Randall*, 60 Idaho 419, 429, 93 P.2d 1, 5 (1939) (quoting *Blackman v. Edsall*, 17 Colo.App. 429, 68 P. 790, 792 (1902)), the Court said:

"It follows from the very nature of the thing that evidence to show undue influence must be largely, in effect, circumstantial. It is an intangible thing, which only in the rarest instances is susceptible of what may be termed direct or positive proof. The difficulty is also enhanced by the fact, universally recognized, that he who seeks to use undue influence does so in privacy. He seldom uses brute force or open threats to terrorize his intended victim, and if he does he is careful that no witnesses are about to take note of and testify to the fact. He observes, too, the same precautions if he seeks by cajolery, flattery, or other methods to obtain power and control over the will of another, and direct it improperly to the accomplishment of the purpose which he desires. . . ."

The *Randall Estate* was in the Supreme Court three times; the other two opinions are found at 58 Idaho 143, 70 P.2d 389 (1937), and 64 Idaho 629, 132 P.2d 763 and 135 P.2d 299 (1943).

the facts and circumstances. Taken singly the facts or circumstances may be of little weight, but taken collectively they acquire their proper weight and may then be sufficient to raise a presumption of undue influence,"

Gmeiner, in challenging the ruling of the trial court, points to nine enumerated instances in the record each of which it is contended gave rise to an inference of undue influence on Yacte's part:

(1) The progressive failure of Beryl's physical and mental health *infers* that she was easily subject to undue influence.

(2) The total value of the receipt of property and cash by Danny from Beryl, without any payment thereof, total failure of consideration, failure of Danny to respond under oath to what consideration was given, evidence in general, together with admissions before trial, and failure of Danny to obey the Court's order compelling answer . . . to Interrogatory No. 4 . . . inferred that there was no consideration involved and no claim of gift was made by Danny as to the total cash and property of about $33,472.00.

(3) The respective ages (77--78) and (32--33), the fascination by Beryl of Danny in the tropical fish business, Beryl's reliance and imposing of confidence in Danny, Beryl's weakening condition and rejection of her sister (plaintiff), *inferred* a confidential relationship.

(4) Danny's failure to admit receipt of about $9300.00 additional funds from Beryl through Ratliff Realty during the deposition a year before trial *infers* Danny's disposition to exert undue influence.

(5) Danny's statement to his supposed wife, Ronda: "You better be nice to Beryl because she is worth $30,000.00 more than I have already gotten out of her," *infers* undue influence.

(6) Danny's statement to Gus Gmeiner, in effect, that: "I am her legal guardian," and statements to plaintiff, in effect, that: "I am her business coordinator," *infers* a disposition to exert control and undue influence over Beryl.

(7) Danny's statement to Don Kilian that the building at Second and Lakeside . . . in effect, that: "This is my building to do as I wish," *infers* undue influence and intention to get more funds and properties.

(8) Danny's attempt to get attorney Frazier to draft a Will for Beryl leaving all of her estate to Danny *infers* control and disposition to exert undue influence.

(9) The transfer of about $33,000.00 of money and properties leaving Beryl with only those assets listed as [¼ interest in commercial building referred to as D. J. MacArthur Estate building; ½ interest in a home in Coeur d'Alene; and ½ interest in ten unimproved lots in Coeur d'Alene] *inferred* a conveyance of a large or substantial portion of Beryl's estate and therefore creating an inference of undue influence under *McNabb v. Brewster*, 75 Idaho 313, 272 P.2d 298 and other cases.

Gmeiner also sets forth in her brief an applicable quotation from 38 C.J.S. *Gifts* § 67 at 887:

The health, age, and mental condition of the donor may afford evidence of the exercise of undue influence, and be sufficient to establish it when considered in the light of other circumstances. If, at the time of the gift, the donor's mind was enfeebled by age and disease, even though not to the extent of producing mental unsoundness, and the donor acted without independent and disinterested advice, and gift was of a large portion or all of the donor's estate, and operated substantially to deprive those having a natural claim to the donor's bounty of all benefit from the donor's estate, these circumstances, if proved and unexplained, will authorize a finding that the gift is void, through undue influence, without proof of specific acts and conduct of the donee.

In the other major text,

It is stated generally that there are four elements of undue influence: (1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence;

and (4) a result indicating undue influence. Among the factors taken into consideration in determining the existence of undue influence are the age and physical and mental condition of the one alleged to have been influenced, whether he had independent or disinterested advice in the transaction, the providence or improvidence of the gift or transaction, delay in making it known, consideration or lack or inadequacy thereof for any contract made, necessities and distress of the person alleged to have been influenced, his predisposition to make the transfer in question, the extent of the transfer in relation to his whole worth, failure to provide for his own family in the case of a transfer to a stranger, or failure to provide for all of his children in case of a transfer to one of them, active solicitations and persuasions by the other party, and the relationship of the parties.

25 Am.Jur.2d *Duress and Undue Influence* § 36 at 397 (1966).

*A Result Which Appears to be the Effect of the Exercise of Undue Influence.*

■ Though generally discussed last in a court's opinion, the suspiciousness of a particular result sets the tempo throughout.[4] A result is suspicious if it appears "unnatural, unjust or irrational." *In re Lunders' Estate*, 74 Idaho 448, 451 362 P.2d 1002 (1953). A property disposition which departs from the natural and expected is said to raise a "red flag of warning," *In re Culver's Estate*, 22 Wis.2d 665, 126 N.W.2d 536, 540 (1964), and to cause the court to scrutinize the entire transaction closely.

On the other hand, apparently unnatural dispositions may be sufficiently explained. Indeed, the law must respect even an "unequal and unjust disposition" once it is determined that such was the intent of the grantor or testator. *Englesby v. Nisula*, 99 Idaho 21, 576 P.2d 1055 (1978). Thus, for

example, the grantee may be particularly deserving by reason of long years of care and the fact "that the grantor was motivated by affection or even gratitude does not establish undue influence." *Mollendorf v. Derry*, 95 Idaho 1, 3, 501 P.2d 199, 201 (1972). The fact that the grantor's natural heirs received sizable bequests will make it difficult for them to challenge grants to another. And the fact that the grantor was known to be displeased with those who were disinherited will serve to explain why they were cut off, whereas a sudden shift in the object of the grantor's choice coincidental with the creation of a confidential relation with the new beneficiary will merit strict court scrutiny. See *McNabb v. Brewster*, 75 Idaho 313, 272 P.2d 298 (1954); *In re Lunders' Estate*, 74 Idaho 448, 263 P.2d 1002 (1953); *In re Estate of Randall*, 60 Idaho 419, 93 P.2d 1 (1939).

*Susceptibility to Undue Influence.*

■ Susceptibility, as an element of undue influence, concerns the general state of mind of the testator: whether he was of a character readily subject to the improper influence of others. Because of inevitable problems in establishing the subjective state of mind of a decedent, it is said to be the most difficult element to establish. The court will look closely at transactions where unfair advantage appears to have been taken of one who is aged, sick or enfeebled. In particular, the court will manifest concern for a grantor who has been proven incapable of handling his or her own business affairs, who is illiterate, or who has undergone marked deterioration of mind and body shortly before the grant, or who has suffered the trauma of recent death in the family. See *McNabb v. Brewster, supra; In re Lunders' Estate, supra.* On the other hand, the Court has made it clear that no presumption of undue influence will arise

---

4. The analysis which follows here parallels that sketched by Van Every, *Undue Influence—Judicial Implementation of Social Policy* 1968 Wis.L.Rev. 568 (hereinafter cited as Van Every). The article presents an exhaustive analysis of several decades of case law in Wisconsin dealing with the issue of undue influence. The author's approach is empirical, focusing on what the Wisconsin Supreme Court *did* and the factors it relied upon rather than upon the legal theories announced. A survey of Idaho case law, it appears, would reach remarkably similar conclusions and the parallel case citations are provided in the text.

simply because the grantor is old, physically infirm or uneducated. *See Englesby v. Ni-sula, supra; Kelley v. Wheyland*, 93 Idaho 735, 471 P.2d 590 (1970).

### *Opportunity to Exert Undue Influence.*

This element is the easiest to establish. Very frequently, the beneficiary will be found to have lived with the testator or grantor. Nothing much can be made of this fact because while it points to an influencer who has a better opportunity, the same set of facts also may suggest that the bequest was natural and the testator was not unfairly taken advantage of. Which characterization is correct may best be considered under the element of "disposition."

### *Disposition to Exert Undue Influence.*

Under the final requirement, the court "examines the character and activities of the alleged undue influencer to determine whether his conduct was designed to take unfair advantage of the testator." "Disposition," in this sense, must mean more than simply the performance of acts of kindness accompanied by the hope of material gain. One factor which assumes critical importance is whether or not the alleged undue influencer took an active part in preparation and execution of the will or deed. The beneficiary of a grantor's largesse will be viewed more suspiciously if he has been active in encouraging the transfer, in contacting the attorney or in preparing and typing the documents. *See McNabb v. Brewster, supra; In re Estate of Randall, supra.* While none of the above factors is per se indicative of undue influence, *Mollendorf v. Derry, supra,* it is clear that undue influence is less likely to be found where it can be shown that the grant was not made at the request, suggestion or direction of the grantee, *Dickey v. Clarke,* 65 Idaho 247, 142 P.2d 597 (1943); where the grantee was not active in the preparation or execution of the documents, *Kelley v. Wheyland, supra* ; or where disinterested advice was sought and third parties were informed of the grantor's intentions.

Another broad area of judicial concern in dealing with the element of "disposition" is the alleged influencer's attempts at undermining bequests to the natural heirs. The court will look closely at situations where the recipient of a deed or bequest has apparently been responsible for alienating the affections of the testator-grantor from the other members of his or her family. The situation is further exacerbated if the grantee has isolated the grantor from all contact with family or with disinterested third parties.

Finally, there are miscellaneous patterns of behavior which cannot be anticipated because they vary from case to case. Nonetheless, such behavior may serve to ground an inference of undue influence or may serve to demonstrate the good faith and honesty of a given transaction. For example, in the *McNabb* case, the recipient of a deed first denied receiving it, later said she didn't remember receiving it, and then concealed its existence from county authorities in requesting indigent aid for the grantor. 75 Idaho at 317, 272 P.2d at 300. In the *Randall* case, the recipients of the bequest were found to have retyped and altered the testator's will. The original, which was less favorable to them, was said to have been "lost." 60 Idaho at 442, 93 P.2d at 11. Conversely, in the *Englesby* case, the court was impressed by the fact that a deed of one's farm to a son rather than to a daughter was in keeping with the Finnish-American custom that the elderly grantor might have been expected to follow. 99 Idaho at 22, 576 P.2d at 1056.

In short, the factors which may serve to ground an inference of undue influence and those which may serve to negate such an inference are as varied as human nature itself. If a plaintiff shows the existence of circumstances of a sort that would warrant an inference of undue influence by a reasonable jury then, of course, defendant is not entitled to a directed verdict. He must shoulder the burden of coming forward to explain his conduct or run the risk of an adverse jury verdict. If, after hearing defendant's explanation, followed by plaintiff's rebuttal evidence, the

jury finds that undue influence has been exercised, then it will find for the plaintiff.

### III

Applying the principles outlined above to the facts of this case, it is clear that the trial court erred in granting defendants' motions for a directed verdict.[5]

Taking the evidence and the inferences to be drawn therefrom in the light most favorable to plaintiff, we hold that Gmeiner made out a *prima facie* case of a confidential relationship and the exercise of undue influence on the part of defendant Danny Yacte. In the last two years of Beryl MacArthur's life, according to plaintiff, she transferred to Danny Yacte almost all the property she possessed (excluding that held in joint name): real estate, insurance proceeds, checks, social security income and estate income legally due to other relatives. At this time, Beryl was in her late 70's and her health was failing so badly that she had to be removed as executrix of her father's estate. Her sudden transfer of property to Yacte was said to be out of character with her life-long reputation as a frugal school teacher. Yacte, for his part, was alleged to have moved in with Beryl, to have isolated her from all contact with her relatives and to have been active in setting up many of the transactions at issue. He was, by his own claim, Beryl's "agent," "legal guardian," and "business representative." His explanation, under statutory cross-examination under the rule, that many of the transfers to him were in "consideration" for Beryl's one-half interest in his fish business, did not serve to dispel this evidence of suspicious and over-reaching behavior since he was unable to document the supposed partnership in any way.

It follows that the trial court's grant of a motion for directed verdict in favor of Danny Yacte must be reversed and the case remanded for a new trial.

With regard to the trial court's grant of a motion for directed verdict in favor of defendants Frushours, we again view the record in the light most favorable to the non-moving party. Mrs. Frushour stated that in May, 1973, Danny was up and down the street trying to peddle the deed to Beryl's house. The Frushours took the deed to the $18,000 property in exchange for a note from Yacte for approximately $6,000. Mrs. Frushour claimed to have done so in order to save Beryl's house and was said to have promised Mrs. Gmeiner and her sister that she would turn the deed over to them, but later refused to do. The Frushours were also said to have played a role in the execution of documents whereby Beryl transferred property to Yacte and to have been present when Yacte allegedly made remarks about his intention to get Beryl's money. The trial court granted the Frushours' motion for a directed verdict, quieted title to the subject property in Danny Yacte and ordered a judicial sale so that the Frushours could be reimbursed on their note.[6]

---

5. The preferred practice, on the part of a trial court faced with a motion for directed verdict, is outlined in 9 Wright & Miller, *Federal Practice and Procedure* § 2533 at 585–86:

   The court has power under the rule [Rule 50(a)] to grant a directed verdict at the close of the plaintiff's case. Nevertheless it has been said to be "the better and safer practice * * * to defer a ruling upon the motion for a directed verdict until both sides have finally rested."

   Even at the close of all the evidence it may be desirable to refrain from directing a verdict though it would be possible to do so. If a verdict is directed and the appellate court holds that the evidence was in fact sufficient to go to the jury, an entire new trial must be had. If, on the other hand, the trial court submits the case to the jury, though it thinks the evidence insufficient, final determination of the case is greatly expedited. If the jury agrees with the court's appraisal of the evidence, and returns a verdict for the party who moved for a directed verdict, the case is at an end. If the jury brings in a different verdict, the trial court can grant judgment notwithstanding the verdict. Then if the appellate court holds that the trial court was in error in its appraisal of the evidence, it can reverse and order judgment on the verdict of the jury, without any need for a new trial.

6. The Frushours, in their answer, admit that they agreed to return the property to Yacte upon payment by him of the amount borrowed.

**10**

This ruling must be reversed. Plaintiff's case against defendants Frushours is inextricably intertwined with that against defendant Danny Yacte. If, on remand, Yacte is found not to have exercised undue influence on Beryl MacArthur, then, as the trial court ruled, title to the real estate in question may be quieted in Yacte, subject to the Frushours' claim to reimbursement for their loan. If, on the other hand, Yacte is found to have unduly influenced Beryl, then there would never have been a gift of the property and Yacte had no right to borrow money on the deed thereto. Under the latter alternative, the question of whether the Frushours were on notice of the alleged undue influence and the question of their motive in making the loan—*i. e.,* whether they were in collusion with Yacte or were volunteers looking out for Beryl's interests—would become crucial matters of fact for the jury to resolve in determining the party from whom the Frushours deserve to be reimbursed.

The judgment of the district court is reversed in all particulars and the case is remanded for new trial. Costs to appellant.

SHEPARD, C. J., and McFADDEN, DONALDSON and BAKES, JJ., concur.