# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 45313

| | | |
|---|---|---|
| In the Matter of the Estate of Victoria H. Smith, Deceased. | ) ) ) ) | |
| VERNON K. SMITH, JR., individually, and in his capacity as the former attorney-in-fact, agent and/or fiduciary for Victoria H. Smith and/or the Estate of Victoria H. Smith, and in any other capacity relevant to these proceedings; and DOES 1-20, | ) ) ) ) ) ) ) ) ) ) | Boise, June 2018 Term |
| Plaintiff-Appellant-<br>Appellant on Appeal, | ) ) ) | Filed: December 18, 2018 |
| v. | ) ) | Karel A. Lehrman, Clerk |
| JOSEPH H. SMITH, an intestate heir of the Estate of Victoria H. Smith, Deceased, | ) ) ) | **SUBSTITUTE OPINION. THE COURT'S PRIOR OPINION DATED JULY 30, 2018, IS HEREBY WITHDRAWN.** |
| Defendant-Respondent-<br>Respondent on Appeal, | ) ) ) | |
| and | ) ) | |
| NOAH G. HILLEN, in his capacity as Personal Representative of the Estate of Victoria H. Smith, | ) ) ) ) ) | |
| Intervenor-Respondent on Appeal. | ) ) | |

Appeal from the Magistrate Court of the Fourth Judicial District of the State of Idaho, Ada County. Honorable Cheri C. Copsey, Senior District Judge, presiding as Magistrate Judge.

The magistrate court's orders are <u>affirmed</u>.

Jones Gledhill Furhman Gourley, PA, Boise, for appellant. Erika P. Judd argued.

Ellis Law, PLLC, Boise, for respondent. Allen B. Ellis argued.

---

BRODY, Justice.

This case centers on the estate of Victoria H. Smith. The magistrate court ruled that Victoria died intestate after finding that her will was a product of the undue influence of her son, Appellant Vernon K. Smith Jr. Vernon appeals from that ruling, as well as an earlier partial summary judgment ruling that invalidated a series of transactions that transferred all of Victoria's assets to a limited liability company that Vernon owned and a corresponding judgment entered pursuant to Idaho Rule of Civil Procedure 70(b). We affirm the decisions of the magistrate court.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Victoria H. Smith was nearly 100 years old when she died on September 11, 2013. During her life she married Vernon K. Smith Sr., a lawyer who died of a heart attack in 1966. The couple had three children: Joseph H. Smith, Vernon K. Smith Jr., and Victoria A. (Smith) Converse. The Smith family members are referred to throughout this opinion as Victoria, Vernon Sr., Joseph, Vernon, and Victoria Converse.

Victoria and Vernon Sr. accumulated substantial real estate and business interests during their lifetimes. Vernon, who is also a lawyer, managed Victoria's legal and business affairs from the time he was licensed to practice law in 1971 until the time she died.

On February 14, 1990, more than twenty years before her death, Victoria prepared a holographic will. Vernon was the only person present when Victoria signed the document. The will stated in full:

> In event of my death I give all my property, real and personal, to my son Vernon with the right to serve as Executor with-out bond. I have given my son Joseph real and personal property in my life time. I have given my daughter, Victoria Converse, personal property in my life time.

> Holographic Will.

> Dated February 14, 1990.

> Victoria H. Smith

In 1999, Victoria executed a durable power of attorney making Vernon her attorney in fact. In 2008, following hospitalization for a fall, Victoria executed a second, more robust power of attorney. Vernon drafted both of these documents. The 2008 power of attorney read in full:

> I, Victoria H. Smith, residing at 5933 Branstetter Street, Boise, Ada County, Idaho, born October 31, 1913, Social Security Number [] does herewith reaffirm, reconfirm and continue the ongoing appointment of my son, Vernon K.

2

Smith Jr., born [], from the original appointment I made in 1999, and to remain authorized to act as my unconditional attorney in fact and agent under this Durable and Irrevocable Power of Attorney, and he is authorized to exercise all powers and authority I otherwise possess and could exercise in my own name and on my own behalf.

The power and authority vested in him is unconditional, unlimited and all inclusive, and he shall have the full and exclusive power and authority to manage and conduct all of my affairs, and to exercise all of my legal rights and powers, including any rights and powers I may acquire in the future, and specifically including, but without any intended limitation, to collect all funds, hold, maintain, improve, invest, lease, or otherwise manage or dispose of any or all of my real or personal property, or any interest therein; purchase, sell, mortgage, encumber, grant, option or otherwise deal in any way in any real property or personal property, tangible or intangible, or any interest therein; to borrow funds, to execute promissory notes, and to secure any obligation by mortgage, deed of trust or pledge; to conduct any and all business and banking needs, of any nature or kind, including the right to sign checks and draw funds on any and all my accounts, with the same authority as my own signature, to sign any and all agreements and documents in my behalf, to continue any corporations, limited liability companies and venture entities I presently have, and to organize, reorganize, merge, consolidate, capitalize, recapitalize, close, liquidate, sell, or dissolve any business interest, and to vote all stock, including the exercise of any stock options and any buy-sell agreements; to receive and to endorse checks and other negotiable paper, to deposit and to withdraw funds from any accounts, by check or by withdrawal slips, or otherwise, to transfer funds from any account and to do so from any bank, savings and loan, or any other financial institution in which I have funds now or in the future; to prepare, sign and file any and all tax returns and other governmental reports and documents, and to represent me in all matters before the Internal Revenue Service or State Tax Commission; to have access to all certificates of deposit, and any safety deposit box registered in my name, whether alone or with others, and to remove any property or papers located therein; to act unconditionally with regard to any funds, stocks, bonds, shares, investments, interests, rights, benefits or entitlements I may now have or hereafter come to have and hold; to engage in any administrative or legal proceedings or lawsuits regarding any rights and interests I have on matters therein; to create trusts and to transfer any interest I may have in property, whether real or personal, tangible or intangible, to the trustee of any trust, to engage and to dismiss agents, counsel, and employees, in connection with any matter, and for purposes, this power and authority vested in my son, Vernon K. Smith Jr., is unlimited, unconditional and all inclusive, and with the same authority and effect as though I had caused the action to be undertaken.

This Durable Power of Attorney is irrevocable and shall remain in full force and effect, having been coupled with adequate consideration, and shall not be affected, altered or impaired by the event of my death or disability, and shall continue in effect for all time, as it has been my long-standing intention and desire that my son, Vernon K. Smith Jr., shall be the sole and exclusive heir of my entire

3

estate, as I have so declared openly in the past many years, because of his commitment, dedication, and devotion to my best interests, welfare, and financial well being.

On July 3, 2012, Vernon formed a limited liability company, VHS Properties, LLC ("VHS" are Victoria's initials). He named his mother and himself as the only members of the company. The next day, Vernon used the 2008 power of attorney to transfer all of Victoria's real and personal property to VHS Properties. He signed the transfer document on behalf of Victoria, as her attorney in fact, and on behalf of VHS Properties, as a member. Vernon then used the 2008 power of attorney to execute a second document, by which he transferred to himself all of Victoria's interest in VHS Properties. He once again signed the document on behalf of Victoria and also signed for himself. By the end of the day on July 4, 2012, Vernon had exclusive ownership and control of all of Victoria's assets.

In 2014, following Victoria's passing, Sharon Bergmann filed a petition seeking the probate of Victoria's estate. In her petition, Bergmann claimed that Vernon, her ex-husband, was in possession of Victoria's will and sought its probate for purposes of satisfaction of an outstanding judgment against him. Soon thereafter, Joseph filed a petition for formal adjudication of Victoria's intestacy and for his appointment as the personal representative of her estate. Within his petition, Joseph acknowledged the existence of the will—which he also claimed was in Vernon's possession—but asserted that Victoria's estate should be subject to intestate administration because the will was invalid as a product of Vernon's undue influence.

Vernon filed responses and objections to both petitions. Bergmann eventually withdrew her petition, acknowledging Joseph's priority, and remained in the proceedings as an interested party. Specific to Joseph's petition, Vernon denied the claim of undue influence and asserted that, regardless of that claim, intestate administration of Victoria's estate would prove meaningless because the estate did not hold any assets as a result of the series of transactions he completed using the 2008 power of attorney. Vernon also separately applied for formal probate of the holographic will and for his appointment as personal representative. Joseph objected to Vernon's petition. He did not contest the will's authenticity, but once again claimed that it was executed as a result of Vernon's undue influence.

Joseph later filed a second petition in conjunction with his earlier request for intestate administration, in which he claimed that Vernon was liable for breach of fiduciary duty and conversion of property. This petition sought, among other things, the restitution of Victoria's

4

estate in light of Vernon's series of transactions, and an accounting of Victoria's income and expenditures made by Vernon. Vernon moved to dismiss the petition pursuant to Idaho Rule of Civil Procedure 12(b)(6) claiming that Joseph lacked standing to bring such claims where he was not a named beneficiary in the holographic will. Joseph voluntarily dismissed his conversion claim. The magistrate court reserved its decision on the dismissal of the breach of fiduciary duty and accounting claims so as to allow Joseph to proceed with his contest of Victoria's will.

Vernon later moved for summary judgment on the issue of undue influence, requesting the dismissal of all of Joseph's claims. The magistrate court denied the motion, finding that there remained genuine issues of material fact regarding the issue of undue influence. Vernon then once again moved to dismiss all of Joseph's claims pursuant to Rule 12(b)(6) or for a judgment on the pleadings pursuant to Idaho Rule of Civil Procedure 12(c). The magistrate court also denied this motion.

Following all of these motions, Joseph moved for partial summary judgment. In his motion, Joseph requested a ruling that Victoria's property was not gifted to VHS Properties because the power of attorney Vernon drafted and used did not expressly authorize the making of gifts. The magistrate court granted Joseph's motion. As part of its ruling, the magistrate court set aside the series of transactions involving Vernon and VHS Properties and ordered Vernon to provide an accounting of the estate's property. Vernon's subsequent motion for reconsideration was denied. Later, after finding that Vernon had failed to provide a satisfactory accounting of the estate's assets and that said assets appeared to be dissipating, the magistrate court appointed a special master and ordered supervised administration of the estate to ensure its assets were preserved.

In October 2016, the magistrate court held a two-day bench trial on the issue of undue influence. The parties then submitted post-trial briefing. On March 9, 2017, the magistrate court issued its Findings of Fact and Conclusions of Law, in which it ruled that Victoria's will was invalid because it was a product of Vernon's undue influence, and that Victoria died intestate. The court later amended its decision to correct minor typographical and clerical errors. In June 2017, the court entered a judgment pursuant to Idaho Rule of Civil Procedure 70(b), which vested title to all of Victoria's real and personal property in the personal representative who had been appointed.

5

Vernon appealed these decisions, and this Court granted Joseph's motion for acceptance of appeal directly from the magistrate court pursuant to Idaho Appellate Rule 44. This appeal follows the parties' stipulation to bifurcate the appeal to first address any matters occurring up to and including the post-trial judgment under Rule 70(b) before considering any matters occurring thereafter. The personal representative of the estate, Intervenor-Respondent Noah Hillen, is not participating in this portion of the appeal.

## II.     ANALYSIS

Vernon asserts that the magistrate court erred in granting Joseph partial summary judgment (and the corresponding Rule 70(b) judgment) and then erred again in its ruling that the will was invalid. Not surprisingly, Joseph argues that these decisions were correctly made. Joseph also contends that Vernon's appeal from the order granting partial summary judgment should be dismissed as untimely. We will start there.

### A.  Joseph's Motion to Dismiss Appeal.

In his motion to this Court requesting acceptance of a direct appeal, Joseph explained that Vernon was appealing from the magistrate court's order granting partial summary judgment and its order invalidating Victoria's will and declaring Victoria's intestacy. He acknowledged that both orders were appealable pursuant to Idaho Code section 17-201. After this Court granted that motion, and thereby allowed the appeal to proceed on both issues, Joseph filed another motion seeking the dismissal of Vernon's appeal from the order granting partial summary judgment, which he contended was untimely. His argument was that the order granting partial summary judgment was appealable when it was entered in November 2016 under Idaho Code section 17-201(5). Because the notice of appeal was not filed until April 13, 2017, his argument was that Vernon's appeal was untimely. We rejected that argument and denied the motion to dismiss. Now, Joseph once more asks this Court to dismiss Vernon's appeal from the order granting partial summary judgment. He does so without advancing any new argument in support. Finding no reason to depart from our earlier decision, we will allow the appeal to proceed.

### B.  Joseph's Motion for Partial Summary Judgment.

In granting partial summary judgment, the magistrate court found that the series of transactions conducted by Vernon using the 2008 power of attorney constituted gifts. Because the 2008 power of attorney did not specifically authorize Vernon to gift Victoria's property, as required under the Uniform Power of Attorney Act, Idaho Code section 15-12-201(1)(b), the

6

magistrate court concluded that the transactions were invalid. Using the remedial provisions of the Act, the magistrate court further declared that Victoria's estate included the gifted property and ordered that no further actions could be taken as to that property prior to a determination on the validity of Victoria's will. The magistrate court also directed Vernon to prepare a complete accounting of the relevant property pursuant to the Act, Idaho Code section 15-12-114(8). Vernon now appeals from that order.

1. **Standard of review**

Appeals from an order of summary judgment are reviewed de novo, and this Court's standard of review is the same standard applied by the trial court. *Trotter v. Bank of N.Y. Mellon*, 152 Idaho 842, 845–46, 275 P.3d 857, 860–61 (2012). Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. I.R.C.P. 56(a). The Court is to liberally construe all disputed facts and draw all reasonable inferences from the record in favor of the nonmovant. *Mackay v. Four Rivers Packing Co.*, 145 Idaho 408, 410, 179 P.3d 1064, 1066 (2008). The movant carries the burden of proving the absence of a genuine issue of material fact. *Banner Life Ins. v. Mark Wallace Dixson Irrevocable Tr.*, 147 Idaho 117, 123, 206 P.3d 481, 487 (2009).

This action was set to be (and eventually was) tried before the trial court without a jury. In that situation, the trial court can rule upon summary judgment despite the possibility of conflicting inferences arising from undisputed evidentiary facts. *Riverside Dev. Co. v. Ritchie*, 103 Idaho 515, 519, 650 P.2d 657, 661 (1982). This is permissible because under such circumstances the court would be responsible for resolving the conflict between those inferences at trial. *Id.* Even with this permission, however, conflicting evidentiary facts must still be viewed in favor of the nonmovant. *Banner Life Ins.*, 147 Idaho at 124, 206 P.3d at 488. This Court exercises free review over the entire record that was before the trial court to determine whether either side was entitled to judgment as a matter of law and reviews the inferences drawn by the trial court to determine whether the record reasonably supports those inferences. *Intermountain Forest Mgmt., Inc. v. La. Pac. Corp.*, 136 Idaho 233, 236, 31 P.3d 921, 924 (2001).

Vernon essentially raises six legal challenges to the magistrate court's order: (1) the magistrate court lacked subject matter jurisdiction over the transferred property; (2) the magistrate court lacked personal jurisdiction over VHS Properties; (3) Joseph lacked standing under the Uniform Power of Attorney Act; (4) Joseph's summary judgment claim was barred by

res judicata or judicial estoppel; (5) the 2008 power of attorney was exempt from adjudication under the Uniform Power of Attorney Act; and (6) the transactions at stake were not gifts. We find none of these arguments to be persuasive.

### 2. The magistrate court had subject matter jurisdiction.

Vernon argues that the magistrate court's partial summary judgment decision was beyond its authority under Idaho Code section 1-2208(2). That statute provides that magistrate courts may be assigned matters involving "[p]roceedings in the probate of wills and administration of estates of decedents, minors and incompetents." I.C. § 1-2208(2). In the summary judgment order, the magistrate court acknowledged that it was acting as a court of general jurisdiction and therefore had authority to adjudicate matters ancillary to its probate assignment. Vernon disagrees, claiming that Joseph's motion was essentially an effort to quiet title under Idaho Code section 6-401, which was beyond the scope of section 1-2208(2). For support, he cites to *Pincock v. Pocatello Gold & Copper Mining Co.*, 100 Idaho 325, 597 P.2d 211 (1979). Vernon's reliance on the *Pincock* decision is misplaced.

In *Pincock*, this Court reviewed a quiet title action that arose following the distribution of six mining lode claims through a probate decree. 100 Idaho at 326–27, 597 P.2d at 212–13. The decedent had been one of the original subscribing stockholders of a since-defunct corporation that had held the lode claims. *Id.* at 326, 597 P.2d at 212. The decedent's sole beneficiaries, the Pincocks, attempted to quiet title on the lode claims in the district court, asserting that the decree from the probate court demonstrated their ownership of the claims. *Id.* at 327, 597 P.2d at 213. The district court granted summary judgment in the Pincocks' favor, but this Court remanded the case due to numerous unresolved issues of material fact. *Id.* at 328, 331, 597 P.2d at 214, 217. Amongst those issues was the unanswered question of whether the defunct corporation had ever transferred title to the lode claims to the decedent. *Id.* at 328, 597 P.2d at 214. The Court explained that this deficiency was significant, as the probate court's "jurisdiction" to distribute the property depended on the decedent being the record owner of that property. *Id.* at 328–29, 597 P.2d at 214–15. The Court quoted the following language from a prior decision:

> [T]he probate courts have exclusive, original jurisdiction in the settlement of estates of deceased persons, and it is within the jurisdiction of those courts to determine who are the heirs of a deceased person and who is entitled to succeed to the estate and their respective shares and interests therein. The decrees of probate courts are conclusive in such matters. A probate court, however, does not have jurisdiction to determine adverse claims or an adverse title to real estate, except in

8

so far as such questions arise between the heirs or devisees of an estate, and are necessary to be determined in the administration of the estate. No such jurisdiction, however, exists in the probate court to determine and adjudicate adverse and conflicting claims to title to real estate as between the estate or heirs thereof and third parties, and such issues can only be tried in a court of competent jurisdiction where the issue as to title and interest is directly and squarely made and presented to the court.

*Id.* at 329, 597 P.2d at 215 (quoting *Miller v. Mitcham*, 21 Idaho 741, 745, 123 P. 941, 942 (1912)).

While the *Pincock* decision uses the term "jurisdiction" it is important to recognize what was at issue in that case and in *Miller*, the case upon which the *Pincock* decision relied. The question presented to the Court in those cases was whether a probate decree distributing real property interests to an heir had any preclusive effect in a subsequent dispute over whether the decedent owned the property. While this Court couched its opinions in terms of jurisdiction, a careful reading of the *Pincock* and *Miller* decisions reveals that the Court decided that there is no preclusive effect to a decree of distribution—not necessarily because the probate court did not have jurisdiction, but because the decedent's actual ownership of the property was not at issue or actually decided during the probate proceedings. In the typical case, when a probate decree distributes Blackacre to son and daughter, it only passes whatever interest the estate had. To put it plainly, *Pincock* is not about the magistrate court's subject matter jurisdiction—it is about the effect of a decree of distribution.

This Court explained the subject matter jurisdiction of the magistrate courts in *Carr v. Magistrate Court of the First Judicial District*, 108 Idaho 546, 700 P.2d 949 (1985). In *Carr*, we stated that article V, section 2 of the Idaho Constitution gave the Legislature the authority to create inferior courts and to specify the jurisdiction of those courts. 108 Idaho at 547, 700 P.2d at 950. The Legislature exercised that authority by creating the magistrate division of the district court and specified through Idaho Codes sections 1-2208 and 1-2210 the cases that are assignable to magistrates. *Id.* at 548, 700 P.2d at 951.

Section 1-2208(2) states that magistrate courts may be assigned matters arising from the "[p]roceedings in the probate of wills and administration of estates of decedents, minors and incompetents." I.C. § 1-2208(2). With this assignment, the Uniform Probate Code—Idaho Code sections 15-12-101 to 15-12-403—broadly provides that "[t]he court has exclusive jurisdiction of formal proceedings to determine how decedents' estates subject to the laws of this state are to be

administered, expended and distributed." I.C. § 15-3-105. Idaho Code section 15-3-106 enables the magistrate court to consider "any other controversy" arising from a probate matter that is not covered by Idaho Code section 15-3-105. I.C. § 15-3-106; *In re Estate v. Peterson*, 157 Idaho 827, 832, 340 P.3d 1143, 1148 (2014). "Since magistrate judges have been assigned responsibility for probate proceedings, all matters related to decedent's [sic] estates should first be considered and determined by the magistrate judge in the probate proceeding." *Miller v. Estate of Prater*, 141 Idaho 208, 213–14, 108 P.3d 355, 360–61 (2005).

This case arose from the parties' petitions for formal probate of Victoria's estate. In his motion for partial summary judgment, Joseph sought a ruling that Vernon did not have authority under the 2008 power of attorney to gift Victoria's property. Joseph asserted that Vernon's unauthorized gifting left the estate with no assets to probate and violated the Uniform Power of Attorney Act. Considering that the Act is found under the Uniform Probate Code it necessarily follows that the magistrate court's determination of this issue was a controversy related to the probate proceeding. As such, the magistrate court had subject matter jurisdiction to rule on the motion.

3. **Vernon's argument that the magistrate court did not have personal jurisdiction over VHS Properties is an improper attack on the failure to join an indispensable party.**

Vernon also argues that the magistrate court erred because it did not have personal jurisdiction over VHS Properties. The record confirms that VHS Properties has never been a party to this action. Vernon's argument is not really about a lack of personal jurisdiction. Rather, his claim of error stems from the fact that VHS Properties was not joined as an indispensable party even though it was a party to Vernon's 2008 transfer of Victoria's property. The problem with this argument is that the failure to join an indispensable party is an affirmative defense that must be raised in a responsive pleading or by motion. *See* I.R.C.P. 12(b)(7), 19. Vernon made a motion to join Victoria Converse as an indispensable party, but the record does not show that he ever made such a motion with respect to VHS Properties or raised the defense in his responsive pleading. Vernon is raising this argument for the first time on appeal and it is improper.

4. **Joseph had standing to petition the series of transactions under the Uniform Power of Attorney Act.**

Vernon next contends that the magistrate court erred by finding that Joseph had standing to challenge the series of transactions pursuant to the Uniform Power of Attorney Act. Section 15-12-116 sets forth which parties may use the Act to petition a court:

> (1) The following persons may petition a court to construe a power of attorney or review the agent's conduct, and grant appropriate relief:
>
> > (a) The principal or the agent;
> >
> > (b) A guardian, conservator or other fiduciary acting for the principal;
> >
> > (c) A person authorized to make health care decisions for the principal;
> >
> > (d) The principal's spouse, parent or descendant;
> >
> > (e) An individual who would qualify as a presumptive heir of the principal;
> >
> > (f) A person named as a beneficiary to receive any property, benefit or contractual right on the principal's death or as a beneficiary of a trust created by or for the principal that has a financial interest in the principal's estate;
> >
> > (g) A governmental agency having regulatory authority to protect the welfare of the principal;
> >
> > (h) The principal's caregiver or another person that demonstrates sufficient interest in the principal's welfare; and
> >
> > (i) A person asked to accept the power of attorney.
>
> (2) Upon motion by the principal, the court shall dismiss a petition filed under this section, unless the court finds that the principal lacks capacity to revoke the agent's authority or the power of attorney.
>
> (3) The court may award reasonable attorney's fees and costs to the prevailing party in a proceeding under this section.

I.C. § 15-12-116.

The magistrate court found Joseph had standing to petition Vernon's use of the 2008 power of attorney under subsection (1)(d), as it was undisputed that he was one of Victoria's descendants.

Vernon first argues that Joseph was required to have sought relief under the Act while Victoria was still alive. In support of this argument, Vernon cites to an unpublished opinion from the Delaware Court of Chancery that found a challenge to a power of attorney to be time barred under Delaware's complementary statutory scheme. *In re Edward J. Burke Estate*, C.A. No. 10768-MA, 2016 WL 4217752, at *4–5 (Del. Ch. Aug. 10, 2016). This opinion has no precedential effect on this Court; however, we will consider Vernon's argument with respect to

11

the language of our statute to determine whether it has any merit. Even though section 15-12-116 uses certain phrasing that lends support to the interpretation suggested by Vernon, nothing in the statute's plain language expressly requires petitions to have been made prior to the principal's death. The statute's accompanying uniform law comments are similarly silent as to an express requirement; however, they do acknowledge that the statute "sets forth broad categories of persons who have standing to petition the court for construction of the power of attorney or review of the agent's conduct." I.C. § 15-12-116 cmt. Given this statement of broad intent, we decline to severely circumscribe the reach of the Act by imposing a time limitation on the filing of petitions where one cannot be found in the statutory text.

Vernon next argues that Joseph lacked standing because, under section 15-12-117, he was not a "successor in interest." The statute Vernon cites to addresses an agent's liability for violating the Act, and states that when a violation is found the agent "is liable to the principal or the principal's successors in interest." I.C. § 15-12-117. Vernon is correct that Joseph was neither the principal, nor a "successor" under the Uniform Probate Code's definition because at the time of the summary judgment proceeding Joseph was not entitled to property under the will. I.C. § 15-1-201(50). Even so, section 15-12-117 is not designed as a second standing requirement that Joseph needed to meet. The statute instead prescribes the means by which a court can impose liability against an agent who is found to have violated the Act. This includes requiring the agent to restore the value of improperly transferred property. I.C. § 15-12-117(1). The magistrate court used this provision, but its determination that the value of the transferred assets was to be restored by Vernon did not disturb Joseph's standing to seek judicial relief through section 15-12-116.

Vernon's final standing challenge is that Joseph did not have the requisite interest to demand an accounting under Idaho Code section 15-12-114(8). The relevant statutory language reads:

> Except as otherwise provided in the power of attorney, an agent is not required to disclose receipts, disbursements or transactions conducted on behalf of the principal *unless ordered by a court* or requested by the principal, a guardian, conservator, other fiduciary acting for the principal, a governmental agency having authority to protect the welfare of the principal or, upon the death of the principal, by the personal representative or successor in interest of the principal's estate.

I.C. § 15-12-114(8) (emphasis added). Regardless of whether Joseph fit one of the roles that the statute enables to request an accounting, Vernon's argument neglects the fact that the accounting here was ordered by the magistrate court pursuant to its own statutorily provided authority.

**5. Joseph's motion was not barred by res judicata or judicial estoppel.**

Vernon also contends that Joseph's motion for partial summary judgment should have been barred by res judicata because it was based on the same facts and theories as Joseph's former claim for conversion. In his reply brief, Vernon claims that if Joseph's motion was not barred by res judicata, it should have been barred by judicial estoppel.

The doctrine of res judicata includes both issue and claim preclusion. *Ticor Title Co. v. Stanion*, 144 Idaho 119, 124, 157 P.3d 613, 618 (2007). While there are separate tests for the two forms of preclusion, each requires there to have been a final judgment on the merits. *Id.* Joseph voluntarily dismissed his conversion claim before filing his summary judgment motion, and nothing in the record suggests that the subject of Joseph's motion was previously adjudicated on the merits.

Vernon's alternative theory is also unconvincing. This Court detailed the doctrine of judicial estoppel in a recent decision:

> Judicial estoppel precludes a party from advantageously taking one position, then subsequently seeking a second position that is incompatible with the first. The policy behind judicial estoppel is to protect the integrity of the judicial system, by protecting the orderly administration of justice and having regard for the dignity of the judicial proceeding. Broadly accepted, it is intended to prevent parties from playing fast and loose with the legal system. Judicial estoppel protects the integrity of the judicial system, not the litigants; therefore, it is not necessary to demonstrate individual prejudice.

*McCallister v. Dixon*, 154 Idaho 891, 894, 303 P.3d 578, 581 (2013) (citations and internal quotation marks omitted).

In making his flawed res judicata challenge, Vernon correctly explained that the arguments in Joseph's initial claim for conversion and his subsequent argument under the Uniform Power of Attorney Act were very similar in nature. It does not therefore follow that those positions were "incompatible." If anything, it shows Joseph's slightly unsuccessful navigation of complicated areas of law before landing on the right vehicle for requesting the remedy that he always desired. This does not qualify as "fast and loose," prejudicial, or a threat to the judicial system's integrity and dignity.

**6. The 2008 power of attorney was not a power coupled with an interest.**

13

Vernon's fifth challenge is that the magistrate court erred by applying the Uniform Power of Attorney Act to the 2008 power of attorney because it was exempted by the Act. Idaho Code section 15-12-103 excludes from the Act certain delegations of authority "because the subject matter of the delegation, the objective of the delegation, the agent's role with respect to the delegation, or a combination of the foregoing, would make application of the Act's provisions inappropriate." I.C. § 15-12-103 cmt. In particular, subsection (1) excludes "[a] power to the extent it is coupled with an interest in the subject of the power, including, but not limited to, a power given to or for the benefit of a creditor in connection with a credit transaction." I.C. § 15-12-103(1). This provision is further explained in an accompanying uniform law comment:

> Paragraph (1) excludes a power to the extent that it is coupled with an interest in the subject of the power. *This exclusion addresses situations where, due to the agent's interest in the subject matter of the power, the agent is not intended to act as the principal's fiduciary. See* Restatement (Third) of Agency § 3.12 (2006) and M.T. Brunner, Annotation, *What Constitutes Power Coupled with Interest within Rule as to Termination of Agency*, 28 A.L.R.2d 1243 (1953). Common examples of powers coupled with an interest include powers granted to a creditor to perfect or protect title in, or to sell, pledged collateral. While the example of "a power given to or for the benefit of a creditor in connection with a credit transaction" is highlighted in paragraph (1), it is not meant to exclude application of paragraph (1) to other contexts in which a power may be coupled with an interest, such as a power held by an insurer to settle or confess judgment on behalf of an insured. *See, e.g.*, *Hayes v. Gessner*, 52 N.E.2d 968 (Mass. 1944).

I.C. § 15-12-103 cmt. (emphasis added).

Section 15-12-103(1) essentially describes powers of attorney that are irrevocable because the benefit of the power rests not with the principal but rather solely with the agent. *See Bailey v. Asta Tech, Inc.*, 999 N.E.2d 138, 146–47 (Mass. App. Ct. 2013) ("In a principal-agent relationship, the principal receives the benefit; for a power coupled with an interest, the benefit inures to the donee himself (or to a third party), but not to the donor.").

Vernon contends that the 2008 power of attorney satisfies the criteria for a power coupled with an interest. The executed document is styled throughout as being "irrevocable," and Vernon has continuously claimed such to be the case. Yet, this alone is not determinative: "A statement in a power of attorney that it is recognized as being irrevocable does not in and of itself establish an interest in the thing upon which the power is to act." *What Constitutes Power Coupled with Interest within Rule as to Termination of Agency*, 28 A.L.R.2d 1243, § 2[c]. Rather, such a determination must be made from the entire agreement and from the facts and circumstances

14

surrounding the parties' relationship. *Id.* § 2[b]. Turning to the record here, it is clear that Vernon acted as Victoria's fiduciary. The language of the 2008 power of attorney further shows that it was designed to benefit both the principal and the agent because Vernon was authorized to act on behalf of Victoria. As emphasized in the comment above, section 15-12-103(1) is meant for situations where a fiduciary relationship *does not exist*. This contradiction notwithstanding, Vernon argues that he had an equitable interest in Victoria's estate by virtue of remodeling work he had completed on certain estate property. The magistrate court acknowledged this claim, but found that nothing suggested that Vernon held legal or equitable title in the estate property consistent with section 15-12-103(1). 28 A.L.R.2d 1243, § 2[d]. Given the record before this Court, we reach the same conclusion. The 2008 power of attorney was not coupled with an interest and therefore the magistrate court did not err by applying the Act.

**7. The series of transactions were gifts and were not authorized by the 2008 power of attorney.**

Finally, Vernon contests the magistrate court's conclusion that the series of transactions constituted gifts under the Act. Idaho Code section 15-12-201(1)(b) requires that gift-making authority be expressly granted in a power of attorney:

> (1) An agent under a power of attorney may exercise the following authority on behalf of the principal or with the principal's property only if the power of attorney expressly grants the agent the authority and exercise is not otherwise prohibited by other agreement or instrument to which the authority or property is subject:
>
> . . . .
>
> (b) Make a gift[.]

I.C. § 15-12-201(1)(b); *see also id.* cmt.; I.C. § 15-12-217 ("Gifts"). "Under Idaho law, a 'gift' is defined to mean 'a voluntary transfer of property by one to another without consideration or compensation therefore.'" *Banner Life Ins. v. Mark Wallace Dixson Irrevocable Tr.*, 147 Idaho 117, 123, 206 P.3d 481, 487 (2009) (quoting *Stanger v. Stanger*, 98 Idaho 725. 728, 571 P.2d 1126, 1129 (1977)).

Vernon first contends that the transactions were not gifts because sufficient consideration was provided. Both of the transfers of Victoria's property—her assets and her membership interest in VHS Properties—were executed "in consideration of the sum of ten dollars and other good, valuable, and lawful consideration." Vernon describes the latter consideration as including the value of commitment, investment, and services he had previously provided to Victoria. Prior

15

to the summary judgment proceedings, Vernon claimed the value of the estate's *real* property to be between $1,000,000 and $2,000,000, while Joseph introduced evidence suggesting an estimated value of $27,000,000.

Ordinarily, this Court will not inquire as to the adequacy of consideration that is bargained for under a private agreement. *Sirius LC v. Erickson*, 150 Idaho 80, 85, 244 P.3d 224, 229 (2010) (quoting *Boise Tower Assocs. v. Hogland*, 147 Idaho 774, 780, 215 P.3d 494, 500 (2009)). This Court has also explained, however, that it will entertain the issue in instances where an inadequacy of consideration "is so gross as to shock the conscience and amount in itself to conclusive evidence of fraud." *Dingler v. Ritzius*, 42 Idaho 614, 619, 247 P. 10, 11 (1926) (quoting 13 C.J. § 329, p. 366). Moreover, in this specific context, other jurisdictions have held that a transfer of property constitutes a gift, as opposed to a sale, if the principal benefits from only nominal consideration. *E.g.*, *Estate of Stephens*, 49 P.3d 1093, 1097 (Cal. 2002) (quoting *Shields v. Shields*, 19 Cal. Rptr. 129, 130–31 (Cal. Dist. Ct. App. 1962)); *Brown v. Laird*, 291 P. 352, 354 (Or. 1930); *see also* Restatement (Second) of Contracts § 79 cmt. d ("Disparity in value, with or without other circumstances, sometimes indicates that the purported consideration was not in fact bargained for but was a mere formality or pretense. Such a sham or 'nominal' consideration does not satisfy the requirement of [exchange].").

In this case, the entirety of Victoria's assets, which included *at least* $1,000,000 in real property, was transferred to VHS Properties for $10 and other nominal and past consideration. These same values were then once again on the move when Vernon transferred Victoria's membership interest in VHS Properties to himself. This disparity is enough for us to inquire into the adequacy of consideration and to conclude that the transactions were indeed gifts.

Vernon also argues that the 2008 power of attorney expressly authorized his ability to gift Victoria's property. This argument turns on the specificity of language required to authorize gift-making ability and satisfy the requirement under section 15-12-201(1)(b). Language in the 2008 power of attorney certainly overlaps with many instances that generically could be considered gift making; however, on its face, the power of attorney does not use the explicit statutory phrase "make a gift." Compare, for instance, the statutory form power of attorney, which offers the following language:

**GRANT OF SPECIFIC AUTHORITY (OPTIONAL)**

16

My agent MAY NOT do any of the following specific acts for me UNLESS I have INITIALED the specific authority listed below:

(CAUTION: Granting any of the following will give your agent the authority to take actions that could significantly reduce your property or change how your property is distributed at your death. INITIAL ONLY the specific authority you WANT to give your agent.)

. . . .

(...)    *Make a gift*, subject to the limitations of the uniform power of attorney act, chapter 12, title 15, Idaho Code, and any special instructions in this power of attorney

(...)    *Make a gift* without limitations except any special instructions in this power of attorney

I.C. § 15-12-301 (emphasis added); *see also* 3 Am. Jur. 2d *Agency* § 27 ("Generally, a power of attorney must be strictly construed. . . . A court cannot imply authority of an attorney-in-fact which the power of attorney itself does not express.").

Given the clear mandate under section 15-12-201(1) and the significance the Act places on unmistakably defining grants of specific authority, we hold that the 2008 power of attorney did not expressly authorize gift-making ability and that therefore Vernon's transactions were correctly invalidated by the magistrate court.

### C. Amended Findings of Fact and Conclusions of Law

After a two-day bench trial, the magistrate court found in favor of Joseph's claim that Victoria died intestate because her will was a product of Vernon's undue influence. In reaching this conclusion, the magistrate court determined first that Vernon failed to rebut a presumption of undue influence, and second that a preponderance of the evidence established the existence of Vernon's undue influence regardless. Vernon argues that the court was incorrect to apply the presumption and that its subsequent determination that he failed to rebut that presumption was also erroneous.

This Court reviews a trial court's conclusions following a bench trial by determining whether the evidence supports the trial court's findings of fact, and whether those findings support the conclusions of law. *Or. Mut. Ins. Co. v. Farm Bureau Mut. Ins. Co. of Idaho*, 148 Idaho 47, 50, 218 P.3d 391, 394 (2009). "This Court will not disturb findings of fact on appeal that are supported by substantial and competent evidence, even if there is conflicting evidence at trial." *Green River Ranches, LLC v. Silva Land Co.*, 162 Idaho 385, 389, 397 P.3d 1144, 1148 (2017). Substantial and competent evidence is relevant evidence that a reasonable mind might

17

accept to support a conclusion. *Id.* (quoting *Lamar Corp. v. City of Twin Falls*, 133 Idaho 36, 42–43, 981 P.2d 1146, 1152–53 (1999)). Our view of the facts will not be substituted for that of the trial court and only erroneous findings will be set aside. *Id.* On the other hand, we will freely review conclusions of law and will draw our own conclusions based on the factual record. *Id.*

### 1. The magistrate court did not err in applying a rebuttable presumption of undue influence.

Prior to trial, the magistrate court ruled that Vernon's pleadings and the record created a rebuttable presumption of undue influence that would be in effect at trial. The court also explained its basis for imposing the presumption in its post-trial order. "[A] rebuttable presumption of undue influence is created where a beneficiary of the testator's will is also a fiduciary of the testator." *Green v. Green*, 161 Idaho 675, 680, 389 P.3d 961, 966 (2017) (quoting *In re Estate of Conway*, 152 Idaho 933, 939, 277 P.3d 380, 386 (2012)).

There is no dispute that Vernon was the sole beneficiary under Victoria's will. Despite some protestations from Vernon, the record also plainly shows that he served as Victoria's fiduciary given his own assertions that at the time of the will's creation he was acting as Victoria's lawyer and Victoria had been relying on him for legal and business advice for nearly two decades. *Skinner v. U.S. Bank Home Mortg.*, 159 Idaho 642, 647–48, 365 P.3d 398, 403–04 (2015). With the two elements of the presumption established, Vernon rests his argument on appeal in the Court's explanation in *Green* that triggering the presumption requires a showing of "some nexus between the fiduciary relationship and the execution of the donative instrument." 161 Idaho at 681, 389 P.3d at 967.

The dispute in *Green* arose from an amendment to a trust that distributed all of the trust assets to one of four siblings following their parents' deaths. *Id.* at 678, 389 P.3d at 964. Amongst those assets was a majority stake in the family corporation, which held sizeable property. *Id.* at 677, 389 P.3d at 963. The three siblings argued that the amendment was a product of their fourth sibling's undue influence. *Id.* After affirming the district court's finding that the fourth sibling did not have an opportunity to exert undue influence, the Court considered the siblings' argument that the district court erred in failing to apply a presumption of undue influence. *Id.* at 680–81, 389 P.3d at 966–67. The Court rejected this argument because the siblings failed to connect their sibling's fiduciary duty as a director for the family corporation to the execution of the trust amendment. *Id.* at 681, 389 P.3d at 967. Instead, the amendment was prepared at the request of the parents by an attorney who had little contact with the fourth

18

sibling. *Id.* ("A presumption of undue influence arises if the alleged wrongdoer was in a confidential relationship with the donor and there were suspicious circumstances surrounding the preparation, formulation, or execution of the donative transfer . . . ." (quoting Restatement (Third) of Property (Wills & Don. Trans.) § 8.3 cmt. f (2003))).

Here, in contrast to *Green*, the record establishes a clear connection between Vernon's fiduciary relationship with Victoria and the creation of his mother's will. At the time of the will's execution, Vernon had been acting as Victoria's lawyer for nearly twenty years. When the will was signed, Vernon was the only other person present. The record does not show that Victoria received independent or disinterested advice prior to the will's creation. Vernon argues that the magistrate court did not refer to or rely upon any facts showing a nexus between his fiduciary role and the creation of Victoria's will; however, the magistrate court emphasized these very facts in making its ruling on the presumption. These facts alone clearly set this case far apart from the situation presented in *Green*. With that being so, Vernon's argument that the magistrate court erred in applying a presumption of undue influence fails.

### 2. The magistrate court's conclusion of undue influence was proper.

With the presumption in place, Vernon faced the burden to present evidence to rebut it at trial. The magistrate court found that he could not. The magistrate court also found that even if Vernon had successfully rebutted the presumption, Joseph met his burden to prove by a preponderance of evidence that Victoria's will was a product of Vernon's undue influence.

Establishing that undue influence produced an instrument requires proof of four elements: "(1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; and (4) a result indicating undue influence." *Green*, 161 Idaho at 680, 389 P.3d at 966 (quoting *Gmeiner v. Yacte*, 100 Idaho 1, 6–7, 592 P.2d 57, 62–63 (1979)). "Once the presumption is applied, the proponent of the instrument bears the burden of rebutting the presumption." *Id.* (citing *Estate of Conway*, 152 Idaho at 939, 277 P.3d at 386). This Court has explained that

> [t]o rebut the presumption, the proponent must come forward with that quantum of evidence that tends to show that no undue influence existed. Once that burden has been met, the matter becomes one for the trier of fact. The existence of undue influence will be determined accordingly, and on appeal such determination will only be disturbed if not supported by substantial, competent evidence.

*Id.* (quoting *In re Estate of Roll*, 115 Idaho 797, 799, 770 P.2d 806, 808 (1989)).

19

Thus, at trial, Joseph carried the burden of proof but Vernon faced an initial burden of production to rebut the presumption. Had he rebutted even one of the four elements of undue influence, Joseph would have had to prove all of the elements by a preponderance of the evidence. *Swaringen v. Swanstrom*, 67 Idaho 245, 253, 175 P.2d 692, 697 (1946). On the other hand, if Vernon failed to do so, the presumption of undue influence would become proven fact. I.R.E. 301; *see also Bongiovi v. Jamison*, 110 Idaho 734, 738–39, 718 P.2d 1172, 1176–77 (1986) (citing Idaho Rule of Evidence 301 and discussing the shifting of burdens of production and proof in undue influence cases).

Broadly, Vernon argues that the magistrate court erred in finding that (1) he did not rebut the presumption, and (2) Joseph sustained his burden of proving all four elements of undue influence. Joseph responds to each of these arguments, asserting that Vernon did not produce a quantum of evidence sufficient to rebut the presumption and that, even so, substantial and competent evidence supported the magistrate court's finding of undue influence.

Before considering the individual elements, it bears emphasizing that establishing undue influence is often heavily reliant on circumstantial evidence and resulting inferences:

It follows from the very nature of the thing that evidence to show undue influence must be largely, in effect, circumstantial. It is an intangible thing, which only in the rarest instances is susceptible of what may be termed direct or positive proof. The difficulty is also enhanced by the fact, universally recognized, that he who seeks to use undue influence does so in privacy. He seldom uses brute force or open threats to terrorize his intended victim, and if he does he is careful that no witnesses are about to take note of and testify to the fact. He observes, too, the same precautions if he seeks by cajolery, flattery, or other methods to obtain power and control over the will of another, and direct it improperly to the accomplishment of the purpose which he desires. Subscribing witnesses are called to attest the execution of wills, and testify as to the testamentary capacity of the testator, and the circumstances attending the immediate execution of the instrument; but they are not called upon to testify as to the antecedent agencies by which the execution of the paper was secured, even if they had any knowledge of them, which they seldom have. Only general rules concerning the amount and character of evidence required to establish undue influence in the execution of a will can be laid down. As to what is sufficient must depend upon the facts and circumstances of each particular case. These general rules have been stated and restated in many hundreds of different cases in the courts of every jurisdiction considered authority in this country. Different language is used by the different courts, but one main, underlying principle, whatever the phraseology, is found in all; and that is that the evidence required to establish it need not be—indeed, cannot be—of that direct, affirmative, and positive character which is required to establish a tangible physical fact. The only positive and affirmative proof required

20

is of facts and circumstances from which the undue influence may be reasonably inferred.

*In re Randall's Estate*, 60 Idaho 419, 429, 93 P.2d 1, 5 (1939) (quoting *Blackman v. Edsall*, 68 P. 790, 792 (Colo. App. 1902)).

### a. Susceptibility

"Susceptibility, as an element of undue influence, concerns the general state of mind of the testator: whether he was of a character readily subject to the improper influence of others." *Gmeiner*, 100 Idaho at 7, 592 P.2d at 63. "Because of inevitable problems in establishing the subjective state of mind of a decedent, it is said to be the most difficult element to establish." *Id.* "The court will look closely at transactions where unfair advantage appears to have been taken of one who is aged, sick or enfeebled." *Id.* This Court has explained that undue influence cannot be presumed simply because the grantor is old, physically infirm or uneducated. *Id.* at 7–8, 592 P.2d at 63–64 (citing *Englesby v. Nisula*, 99 Idaho 21, 576 P.2d 1055 (1978); *Kelley v. Wheyland*, 93 Idaho 735, 471 P.2d 590 (1970)). Instead, determining whether a testator was susceptible to undue influence

> requires a consideration of many circumstances, including his state of affections or dislike for particular persons, benefited or not benefited by the will; of his inclinations to obey or to resist these persons; and, in general, of his mental and emotional condition with reference to its being affected by any of the persons concerned.

*King v. MacDonald*, 90 Idaho 272, 279, 410 P.2d 969, 972 (1965) (quoting 6 Wigmore, *Evidence* § 1738, p. 121 (3d ed. 1940)).

The magistrate court found that the totality of the evidence supported an inference that Victoria was susceptible to Vernon's undue influence. In reaching that conclusion, the magistrate court relied on its factual findings that Victoria prepared her will with Vernon's advice and that Victoria had long-standing trust in and reliance upon Vernon. The magistrate court also looked to temporally relevant examples of Victoria's susceptibility, including her participation in a "straw man" scheme that Vernon had devised during his pending divorce to deprive his then-wife from a house she had owned prior to their marriage ("the Raymond Street transaction"), an affidavit she filed on Vernon's behalf during his divorce wherein she testified that significant property at issue in the divorce was hers so that it could not be considered community property of the marriage, and her disproportionate provision of gifts and loans to Vernon.

To counter this evidence, Vernon argues that the record instead shows that Victoria was more than capable of managing her own affairs. In particular, he points to evidence indicating that Victoria was not aged, sick, or enfeebled, and that she was self-dependent and active in the community. He also contends that language in Victoria's affidavit directly established that she had an ability to resist his influence and contests the magistrate court's conclusions regarding the Raymond Street transaction and his influencing Victoria to participate in those events. Finally, he asserts that the fact his mother gave him gifts during the relevant time period is meaningless, as she also gave gifts to Joseph at that time.

The magistrate court's conclusion on this element is supported by substantial and competent evidence. It is undisputed that at the time of the will's creation, Victoria was competent and not aged, sick, or enfeebled. Moreover, as the magistrate court acknowledged, evidence showing Victoria's strong-willed nature may be suggestive of the fact that she was not susceptible to influence *generally*. On the whole, however, the evidence gives rise to a strong inference that she was susceptible to Vernon's *specific* influence. Vernon explained as much in his pleadings, asserting that he had been the "sole responsible individual for the management and control of all assets and interests owned by Victoria." While Vernon has his own opinions with regard to the events that Victoria participated in on his behalf, the magistrate court's factual finding that he was not a credible witness given his actions and testimony at trial is supported by the record. The findings regarding Victoria's creation of her will with Vernon's assistance and her participation in other dealings of questionable circumstances that benefitted Vernon also lead to the conclusion that she was subject to his influence.

### b. Opportunity

In *Gmeiner*, the Court explained that this element is the "easiest to establish." 100 Idaho at 8, 592 P.2d at 64 (noting that very frequently the beneficiary is found to have lived with the testator). As noted above, the element was not established in *Green* because the instrument was drafted by an independent attorney at the testators' request and without involvement of the alleged wrongdoer. 161 Idaho at 680, 389 P.3d at 966; *see also Estate of Conway*, 152 Idaho at 940, 277 P.3d at 387 (stressing the importance of the testator receiving independent and disinterested advice in the creation of the will and the distance between the testator and alleged wrongdoer at the time of the instrument's execution).

22

The magistrate court found that the totality of the evidence supported an inference that Vernon had an opportunity to subject Victoria to undue influence. Most notable was Victoria's long-standing reliance on Vernon for legal and business advice and his solo presence at the will's execution. Vernon acknowledges that he was present when Victoria executed her will, but argues that such presence was prompted by her and involved no active participation on his part. Despite this theory, Vernon has not produced evidence to overcome the relevant factual findings of the magistrate court, and therefore his argument is left without support. While he did not live with Victoria during the relevant time period, that fact alone is not dispositive. The rest of the evidence clearly evinces that Vernon had an opportunity to exert undue influence consistent with this Court's explanations of the element in *Gmeiner* and *Green*.

### c. Disposition

When considering this element, "the court examines the character and activities of the alleged undue influencer to determine whether his conduct was designed to take unfair advantage of the testator." *Gmeiner*, 100 Idaho at 8, 592 P.2d at 64.

> One factor which assumes critical importance is whether or not the alleged undue influencer took an active part in preparation and execution of the will or deed. The beneficiary of a grantor's largesse will be viewed more suspiciously if he has been active in encouraging the transfer, in contacting the attorney or in preparing and typing the documents.

*Id.* (highlighting that undue influence is less likely with inactive grantees and when the grantor receives disinterested advice from third parties) (citing *McNabb v. Brewster*, 75 Idaho 313, 272 P.2d 298 (1954); *Estate of Randall*, 60 Idaho 419, 93 P.2d 1).

> Another broad area of judicial concern in dealing with the element of "disposition" is the alleged influencer's attempts at undermining bequests to the natural heirs. The court will look closely at situations where the recipient of a deed or bequest has apparently been responsible for alienating the affections of the testator-grantor from the other members of his or her family. The situation is further exacerbated if the grantee has isolated the grantor from all contact with family or with disinterested third parties.

*Id.*

This Court has also noted the possibility of case-specific behavior that may give rise to an inference of undue influence or, on the other hand, show good faith and honesty:

> For example, in the *McNabb* case, the recipient of a deed first denied receiving it, later said she didn't remember receiving it, and then concealed its existence from county authorities in requesting indigent aid for the grantor. 75 Idaho at 317, 272 P.2d at 300. In the *Randall* case, the recipients of the bequest were found to have

23

retyped and altered the testator's will. The original, which was less favorable to them, was said to have been "lost." 60 Idaho at 442, 93 P.2d at 11. Conversely, in the *Englesby* case, the court was impressed by the fact that a deed of one's farm to a son rather than to a daughter was in keeping with the Finnish-American custom that the elderly grantor might have been expected to follow. 99 Idaho at 22, 576 P.2d at 1056.

*Id.*

The magistrate court found that the totality of the evidence supported an inference that Vernon had a disposition to exert undue influence. The magistrate court emphasized the lack of disinterested advice in the will's creation, the lack of outside knowledge of the will's existence for many years, and Vernon's active involvement in the will's preparation and execution. The magistrate court also returned to the character and activities of Vernon, noting that the Raymond Street transaction and the 2012 power of attorney transactions demonstrated a propensity to take unfair advantage of others, and that other evidence showed that he made consistent efforts to isolate his mother and alienate her affections. Vernon argues that the magistrate court erroneously applied the law to reach its conclusion that he had a disposition to exert an undue influence. His primary complaint is that the magistrate court relied on evidence that was not temporally proximate to the creation of the will. He also disputes the magistrate court's inference that he isolated Victoria, noting that his brother lived very close to their mother at the time of the will's creation.

Vernon's arguments are not persuasive. To start, he inaccurately describes the nature of the magistrate court's consideration of this element. The magistrate court first looked to the circumstances surrounding Victoria's creation of her will, which it found showed Vernon had a disposition to exert undue influence. Contrary to Vernon's contention, the magistrate court's conclusion was well supported by evidence regarding the will's creation. Once that foundation was established, the magistrate court then stated that this inference was corroborated by evidence from outside of the relevant time period that showed that Vernon had such a disposition. In so doing, the magistrate court explained that Vernon's undue influence could alternatively be described as the long-lasting retention of control over Victoria that Vernon had captured prior to her creation of the will. Vernon's argument that Joseph lived near Victoria fails to effectively rebut the evidence showing that he was involved in the will's creation, he was the primary cause of the eventual estrangement of his mother from Joseph, and he engaged in efforts to alienate and

24

isolate his mother and her affections. Collectively, these facts lead to the conclusion that Vernon was disposed to exert undue influence.

### d. Result

The final element requires the court to look to the outcome of the will in question. "A result is suspicious if it appears 'unnatural, unjust or irrational.'" *Gmeiner*, 100 Idaho at 7, 592 P.2d at 63 (quoting *In re Lunders' Estate*, 74 Idaho 448, 451, 362 P.2d 1002, 1004 (1953)). "A property disposition which departs from the natural and expected is said to raise a 'red flag of warning,' and to cause the court to scrutinize the entire transaction closely." *Id.* (citing *In re Culver's Estate*, 126 N.W.2d 536, 540 (Wis. 1964)). Seemingly unnatural dispositions are not per se products of undue influence, however:

> [T]he law must respect even an "unequal and unjust disposition" once it is determined that such was the intent of the grantor or testator. Thus, for example, the grantee may be particularly deserving by reason of long years of care and the fact that the grantor was motivated by affection or even gratitude does not establish undue influence. The fact that the grantor's natural heirs received sizable bequests will make it difficult for them to challenge grants to another. And the fact that the grantor was known to be displeased with those who were disinherited will serve to explain why they were cut off, whereas a sudden shift in the object of the grantor's choice coincidental with the creation of a confidential relation with the new beneficiary will merit strict court scrutiny.

*Id.* (citations and quotation marks omitted).

The magistrate court found the result of Victoria's will was unnatural, unjust, and irrational, and that evidence intimated that it was a product of Vernon's undue influence. In reaching this conclusion, the magistrate court pointed to its findings that there was no credible evidence showing that Victoria was estranged from Joseph or Victoria Converse at the time of the will's creation and that Vernon was instrumental in creating any estrangement that subsequently occurred. Vernon claims that he at least sufficiently rebutted the presumption that Victoria's will was unnatural by producing evidence that explained the will's unequal distribution was consistent with his mother's intent.

The magistrate court's conclusion is correct. The result of Victoria's will is unnatural given the size of the estate (which also included the still-open estate of Vernon Sr.). While that alone does not tip the element, evidence showing that Victoria was not estranged from Joseph and Victoria Converse at the time of the will's creation is suggestive. Moreover, with respect to Joseph, the record indicates that in many ways he and his family carried on a strong and positive

25

relationship with Victoria for several years following the execution of her will. When these facts are compared with the disposition of Victoria's will that completely disinherits Joseph and Victoria Converse, an inference arises that the will was a product of undue influence. Vernon did not produce sufficient evidence to overcome that suspicion.

### e. Other factors

The magistrate court concluded that the four elements of Vernon's undue influence were established. Vernon contends it still erred by failing to apply "the remaining *Conway* factors." In *Gmeiner*, this Court adopted the foregoing four-element analysis from the American Jurisprudence treatise on duress and undue influence. 100 Idaho at 6–7, 592 P.2d at 62–63 (quoting 25 Am. Jur. 2d *Duress and Undue Influence* § 36, at p. 397 (1966)). In addition to those elements, the treatise provided a host of other considerations to account for in situations of possible undue influence:

> Among the factors taken into consideration in determining the existence of undue influence are the age and physical and mental condition of the one alleged to have been influenced, whether he had independent or disinterested advice in the transaction, the providence or improvidence of the gift or transaction, delay in making it known, consideration or lack or inadequacy thereof for any contract made, necessities and distress of the person alleged to have been influenced, his predisposition to make the transfer in question, the extent of the transfer in relation to his whole worth, failure to provide for his own family in the case of a transfer to a stranger, or failure to provide for all of his children in case of a transfer to one of them, active solicitations and persuasions by the other party, and the relationship of the parties.

*Id.* Vernon's description of these considerations as the "*Conway* factors" seems to arise from the Court's restatement of this excerpt in *Estate of Conway*, 152 Idaho at 939, 277 P.3d at 386.

Vernon argues that among these factors evidence showed that Victoria made it known to other parties that she had drafted a will and was leaving her entire estate to Vernon. He also contends that Joseph's own correspondence with Victoria implied that he was aware of her intent. As this Court explained in *Conway*, this list of additional considerations is "[e]vidence relevant to the question of undue influence." *Id.* While the magistrate court did not proceed through these considerations in piecemeal fashion—which makes sense given that they are not individualized factors akin to the four-element analysis adopted in *Gmeiner*—it is disingenuous to state that the magistrate court did not account for evidence of this nature in its analysis when relevant. This includes the evidence Vernon cites to. While conflicting evidence and testimony

exists in the record and was presented at trial, Vernon has failed to show that the magistrate court's legal conclusions are not supported by substantial and competent evidence.

### 3. The magistrate court did not abuse its discretion in its evidentiary rulings.

Vernon also contests two evidentiary rulings that were made by the magistrate court. "This Court reviews challenges to a trial court's evidentiary rulings under the abuse of discretion standard." *Vreeken v. Lockwood Eng'g, B.V.*, 148 Idaho 89, 106, 218 P.3d 1150, 1167 (2009) (quoting *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 50, 995 P.2d 816, 820 (2000)). "Error is disregarded unless the ruling is a manifest abuse of the trial court's discretion and affects a substantial right of the party." *Id.* (quoting *Perry*, 134 Idaho at 51, 995 P.2d at 821). To determine if a trial court abused its discretion, this Court considers whether the trial court (1) perceived the issue as one of discretion, (2) acted within the outer boundaries of that discretion, (3) acted consistently with the legal standards applicable to the specific choices available to it, and (4) reached its decision by an exercise of reason. *Lunneborg v. My Fun Life*, 163 Idaho 856, 63, 421 P.3d 187, 195 (2018).

### a. Admission of certain temporally distant evidence

Vernon challenges the magistrate court's admission of certain evidence as being far removed from the will's creation and execution. He specifically disputes the admission of evidence regarding the 2008 power of attorney transactions and the trial testimony of Victoria's priest. This argument is consistent with a pair of motions in limine that Vernon filed before trial for the purpose of identifying and limiting the scope of admissible evidence on the issue of undue influence. During a pretrial hearing, the magistrate court deferred its ruling on the motions and explained that such matters would be better adjudged at trial. Then, following trial, the magistrate court partially granted the motions. Specifically, the magistrate court explained that for purposes of assessing the existence of undue influence, it would only consider competent evidence, and inferences drawn therefrom, from approximately one year prior to and six months after the will was executed. The magistrate court also explained that this ruling did not limit its ability to consider evidence and inferences falling outside of that window for other purposes, such as to corroborate an already made finding of undue influence or to establish an unbroken chronology of the relationship between Vernon and Victoria.

As discussed above under the disposition element, when considered, the magistrate court made clear that it was using temporally distant evidence for corroborating or reinforcing

purposes only. Admission of evidence for these purposes is consistent with other jurisdictions who have considered the same issue. *See, e.g.*, *In re Estate of Laitinen*, 483 A. 2d 265, 268 (Vt. 1984) ("[E]vidence which tends to show that the beneficiary acquired control over the testator's mind before the will was made, and retained such control beyond the period at which the will was executed, is admissible . . . ." (citation omitted)). With appropriate constraints in place, the magistrate court's admission of the disputed evidence was proper.

### b. Refusal of admission of Victoria Converse email

Vernon also contends that the magistrate court erred in its refusal to admit an exhibit at trial, which was purported to be an email from Victoria Converse to Vernon and Joseph regarding her relationship with the siblings' mother. The email was sent following Victoria's passing in 2013. The magistrate court refused admission of the email, finding that it was hearsay and not relevant to the issue of Vernon's undue influence. Vernon argues that the email was relevant because it offered justification for Victoria Converse's disinheritance in the will, which ran contrary to the magistrate court's factual finding that no such evidence existed. Given its relevance, Vernon contends that it should have been admitted despite being hearsay either as an admission by party opponent, I.R.E. 801(d)(2), or through the hearsay exception for statements against interest, I.R.E. 804(b)(3). The magistrate court did not abuse its discretion in refusing to admit the email.

There was a lengthy exchange between counsel and the magistrate court concerning the admissibility of the email. While the magistrate court concluded that the email was not relevant and contained inadmissible hearsay, it also left the door open for Vernon to redact the hearsay portions and seek to re-admit the exhibit:

> Quite frankly, counsel, I don't agree with you. This was written some 20 years after this will was put in place. The issue is what was – whether the mother was unduly influenced back in the early 90s when she – or just prior to her writing this holographic will. It is not relevant that this daughter upon her death bed some 20 years later has certain feelings and is expressing it. She is also not a party in this case. I understand that she may benefit, but there is no evidence that she is actually participating in this case. So I am going to sustain the objection and I am not going to consider it at all.
> Now, if the parties want to work out some way to redact those portions which are clearly not hearsay, and I have not read this document so I don't know what portions those might be. So I just don't see this as admissible. This is all about – these are all her statements. You want me to accept it for the truth of the matter asserted so it is clearly an out of court statement. It is hearsay. And the

only issue is, does it fall within the exception? And so far the only exception you have given, it seems to me, an admission of a party opponent. She is not a party to this case by your own statement.

Counsel: Well, it's also an admission against interest because she has an interest in this case and a punitive (sic) heir under the statute. Whether she is here to advance or not.

Court: I am not going to admit this at this time. You have to provide an awful lot of support for it for me to admit it.

After testifying the next day that Converse was unavailable as a witness because she lived out-of-state and was beyond the court's subpoena power, Vernon again moved to admit the email, arguing that it was a statement against interest and advancing other grounds for admission that are not raised on appeal. The magistrate court again refused to admit the exhibit.

The magistrate court's refusal to admit the exhibit was consistent with I.R.E. 801(d)(2) because Converse is not a party to this action. The fact that she might possibly have some interest in the outcome as a putative heir does not make her a party.

The magistrate court's decision was also consistent with I.R.E. 804(b)(3) which provides that an out of court statement is not hearsay if the declarant is unavailable and it is:

[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid a claim by declarant against another, that a reasonable man in declarant's position would not have made the statement unless declarant believed it to be true. A statement tending to expose the declarant to criminal liability and offered in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

I.R.E. 804(b)(3). We recently addressed the application of this exception in the criminal context in *State v. Robins*, explaining that this rule requires the court to consider each statement included in a broader narrative to determine whether the statement is in fact one that is so far contrary to the declarant's interests that a reasonable person in the declarant's position would not have made it unless the declarant believed it to be true. No. 44296, 2018 WL 6254427, at *1 (Idaho Nov. 30, 2018). In *Robins*, we went through a letter sentence by sentence and determined that only one sentence was genuinely self-inculpatory and met the requirements of I.R.E. 804(b)(3). *Id.* at *12–14.

Even without the benefit of our decision in *Robins*, the magistrate court recognized how I.R.E. 804(b)(3) operates when it ruled that Vernon could redact the hearsay from the email and seek to admit those portions which reflected statements against interest. It does not appear from

the record that Vernon ever did so. As a result, the magistrate court's decision was consistent with applicable legal standards, and no abuse of discretion has been shown.

### D. Attorney's Fees and Costs

Joseph requests attorney's fees on appeal pursuant to Idaho Code sections 12-121 and 15-8-208. Vernon asserts that the magistrate court erred by determining Joseph the prevailing party below, and requests that this Court remand the case to make a finding that he was the prevailing party. He also seeks costs below and on appeal. Joseph is the prevailing party on appeal and nothing suggests that the magistrate court's prevailing party determination was incorrect.

Turning to Joseph's requests, in reverse order, section 15-8-208 allows for discretionary costs and reasonable attorney's fees for proceedings governed by the Trust and Estate Dispute Resolution Act ("TEDRA"), Idaho Code sections 15-8-101 to 15-8-305. The statute permits the court to award costs and fees from any party, assets of the estate or trust, or nonprobate asset that is subject of the proceedings. I.C. § 15-8-208(1); *Quemada v. Arizmendez*, 153 Idaho 609, 617, 288 P.3d 826, 834 (2012). Unlike in *Quemada*, Joseph did not file his initial petition for probate pursuant to TEDRA, Idaho Code section 15-3-302. As such, this was not a TEDRA proceeding and its costs and fees provision does not have applicability here.

Section 12-121 allows for an award of reasonable attorney's fees to the prevailing party in cases that have been brought, pursued or defended frivolously, unreasonably or without foundation. I.C. § 12-121. Although some of Vernon's arguments on appeal misconstrue certain findings and conclusions of the magistrate court, other issues have been reasonably raised in an attempt to sort out a procedurally complex action. Given this, it cannot be said that this appeal was pursued frivolously, unreasonably, or without foundation, and we will decline to award fees pursuant to section 12-121.

### III.    CONCLUSION

In light of the foregoing, the decisions of the magistrate court are affirmed. Costs are awarded on appeal to Joseph.

Chief Justice BURDICK, Justices HORTON, BEVAN, and Justice Pro Tem TROUT CONCUR.